KING, Circuit Judge, joined by EDITH H. JONES, Chief Judge, E. GRADY JOLLY, W. EUGENE DAVIS, JERRY E. SMITH, EMILIO M. GARZA, BENAVIDES, CARL E. STEWART, EDITH BROWN CLEMENT, PRADO, OWEN, JENNIFER WALKER ELROD, LESLIE H. SOUTHWICK, HAYNES and GRAVES, Circuit Judges:
For the third time, the en banc court is called upon to decide whether a public school student has stated a constitutional claim against her school for its failure to protect her from harm inflicted by a private actor. Relying on our prior en banc opinions, the district court found that she had failed to state a claim and dismissed her complaint. A panel of this court reversed in part, concluding that the student had a special relationship with her school under DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and that the school was therefore constitutionally obligated to protect her from acts of private violence. The panel nevertheless granted qualified immunity to those defendants sued in their individual capacities. We granted rehearing en banc, thereby vacating the panel opinion. We now hold that the student did not have a DeShaney special relationship with her school, and her school therefore had no constitutional duty to protect her from harm inflicted by a private actor. We also hold that the student has failed to state a claim under the state-created danger theory or under a municipal liability theory. We therefore affirm the judgment of the district court.
I. FACTUAL AND PROCEDURAL BACKGROUND
During the 2007-2008 school year, Jane Doe (“Jane”) attended an elementary *853 school in Covington County, Mississippi. She was nine years old at the time. At some point during the school year, Jane’s guardians filled out a “Permission to Check-Out Form,” on which they listed the names of the individuals with exclusive permission to “check out” Jane from school during the school day. On six separate occasions between September 2007 and January 2008,[1] school employees allowed a man named Tommy Keyes (“Keyes”), who allegedly bore no relation to Jane and was not listed on her checkout form, to take Jane from school. On these occasions, Keyes took Jane from school without the knowledge or consent of her parents or guardians, sexually molested her, and subsequently returned her to school. On the first five occasions, Keyes signed out Jane as her father. On the final occasion, he signed her out as her mother. The complaint alleges that Keyes was able to gain access to Jane because the policy promulgated by the various school officials permitted school employees to release Jane to Keyes without first verifying Keyes’s identification or whether he was among those people listed on her “Permission to Check-Out Form.” The complaint contends that this policy created a danger to students and the implementation and execution of the policy constituted deliberate indifference towards the rights and safety of those students, including Jane. This policy is alleged to be the direct and proximate cause of Jane’s injury. The complaint thus assigns a passive role to school employees, alleging that the school violated Jane’s constitutional rights by “allowing the Defendant, Tommy Keyes, to check the minor child out from school” without verifying his identity or his authorization to take the child. It also alleges that the school policy permitted school employees to release students to individuals without checking their identification or authorization, but did not require them to do so. The policy thus delegated to school employees the discretion to release a student without verifying an adult’s identity or his authorization. Furthermore, the complaint does not claim that any school employee had actual knowledge that Keyes was not authorized to take Jane from school, only that the employees did not check Keyes’s identification or verify that he was among the adults listed on Jane’s check-out form.
Jane, her father, and her paternal grandmother (together, the “Does”) sued the Covington County School District; the Covington County Superintendent of Education, I.S. Sanford, Jr., in his official and individual capacities; the Covington County School Board; and the President of the Covington County School Board, Andrew Keys, in his official and individual capacities (together, “Education Defendants”). The Does also named Keyes and other unnamed education defendants in their official and individual capacities. The Does asserted due process and equal protection claims under 42 U.S.C. §§ 1983, 1985, and 1986,[2] as well as various state law causes of action.
*854 On the Education Defendants’ motion, the district court dismissed the Does’ federal claims for failure to state a claim and declined to exercise supplemental jurisdiction over the remaining state law claims. The court concluded that under the Supreme Court’s decision in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), Jane had no constitutional right to be protected from harm inflicted by a private actor such as Keyes except under one of two narrow exceptions — the “state-created danger” theory and the “special relationship” exception. The district court assumed that the state-created danger theory was available in this circuit, but held that the Does had not sufficiently pleaded a due process violation based on that theory. The court thus determined that the “primary question” was whether the Does could state a claim based on a special relationship between Jane and the Education Defendants, and concluded that the claim was foreclosed by our precedent.
On appeal, a majority of a panel of this court reversed the district court’s judgment in part. The majority found that the Does had pleaded a facially plausible claim that the school had violated Jane’s substantive due process rights by virtue of its special relationship with her and its deliberate indifference to known threats to her safety. Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Bd. of Educ., 649 F.3d 335, 353-54 (5th Cir.2011). The panel majority, however, affirmed the district court’s qualified-immunity dismissal of Jane’s constitutional claim against those Education Defendants sued in their individual capacities. Id. We ordered rehearing en banc. Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Bd. of Educ., 659 F.3d 358 (5th Cir.2011). For the reasons set forth herein, we now affirm the judgment of the district court.
II. STANDARD OF REVIEW
We review a district court’s dismissal under Rule 12(b)(6) de novo, “accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs.” Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008) (citation and internal quotation marks omitted). To survive dismissal pursuant to Rule 12(b)(6), plaintiffs must plead “enough facts to state a claim to relief that is plausible on its face.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); Cornerstone Christian Schs. v. Univ. Interscholastic League, 563 F.3d 127, 133 (5th Cir.2009). “A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). Our task, then, is “to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiffs likelihood of success.” Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir.2010) (citing Iqbal, 129 S.Ct. at 1949).
III. DISCUSSION
To state a claim under 42 U.S.C. § 1983, “a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.” James v. Tex. Collin Cnty., *855 535 F.3d 365, 373 (5th Cir.2008) (citation and internal quotation marks omitted). The central issue here is whether the Does have in fact alleged the violation of a constitutional right. Because we find that they have not, we affirm the district court’s dismissal of this case.

A. DeShaney Special Relationship

Jane’s constitutional claim against the Education Defendants is based not upon Keyes’s molestation oí Jane, but rather upon the school’s allegedly deficient checkout policy, which allowed the molestation to occur.[3] Jane’s constitutional claim can proceed, therefore, only if the Education Defendants had a constitutional duty to protect Jane from non-state actors. This duty, in turn, may exist if there is a special relationship, as contemplated by DeShaney, between Jane and her school. See Walton v. Alexander, 44 F.3d 1297, 1300-01 (5th Cir.1995) (en banc). We begin by reviewing DeShaney and its progeny, then consider the application of this law in the context of this case.
1. DeShaney Recognizes a Limited Duty to Protect
DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), arose out of the tragic case of young Joshua DeShaney, who had been placed in state custody after the Winnebago County Department of Social Services suspected his father of child abuse. The agency subsequently returned Joshua to his home after finding insufficient evidence of abuse. Once at home, Joshua continued to endure beatings from his father, and was ultimately left with severe brain damage. Id. at 191-93, 109 S.Ct. 998. Joshua DeShaney and his mother sued the Winnebago County Department of Social Services and various individual defendants, alleging that the Department and its employees had violated Joshua’s substantive due process right by failing to protect him from his father’s violence even though they knew that he faced a very real danger of harm. Id. at 193, 109 S.Ct. 998. The Supreme Court rejected this claim, and held that the plaintiffs could not maintain an action under § 1983 because there had been no constitutional violation. Id. at 202, 109 S.Ct. 998. The Court noted that the Fourteenth Amendment was enacted to “protect the people from the State, not to ensure that the State proteet[ ] them from each other.” Id. at 196, 109 S.Ct. 998. The Due Process Clause, the Court explained, “forbids the State itself to deprive individuals of life, liberty, or property without ‘due process of law,’ but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.” Id. at 195, 109 S.Ct. 998. Thus, the Court concluded that “a State’s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.” Id. at 197, 109 S.Ct. 998.
The Court noted that this categorical rule is subject to at least one very limited exception.[4] Under this exception, a state *856 may create a “special relationship” with a particular citizen, requiring the state to protect him from harm, “when the State takes a person into its custody and holds him there against his will.” Id. at 199— 200, 109 S.Ct. 998. In such instances, “the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.” Id. at 200, 109 S.Ct. 998. That special relationship exists when the state incarcerates a prisoner, Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), or involuntarily commits someone to an institution, Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The DeShaney Court reasoned that:
when the State by the affirmative exercise of its power so restrains an individual’s liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.
DeShaney, 489 U.S. at 200, 109 S.Ct. 998. The Court stated that “[t]he affirmative duty to protect arises not from the State’s knowledge of the individual’s predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.” Id.
In addition to the circumstances of incarceration and involuntary institutionalization recognized by the Court in DeShaney, we have extended the special relationship exception to the placement of children in foster care. Griffith v. Johnston, 899 F.2d 1427, 1439 (5th Cir. 1990). We reasoned that the state assumes a constitutional duty to care for children under state supervision because “the state’s duty to provide services stems from the limitation which the state has placed on the individual’s ability to act on his own behalf.” Id. We have not extended the DeShaney special relationship exception beyond these three situations, and have explicitly held that the state does not create a special relationship with children attending public schools.
2. Schools and the Special Relationship Exception in the Fifth Circuit
We have twice considered en banc whether the special relationship exception to the DeShaney rule applies in the context of public schools. Doe v. Hillsboro Indep. Sch. Dish, 113 F.3d 1412 (5th Cir. 1997) (en banc); Walton v. Alexander, 44 F.3d 1297 (5th Cir.1995) (en banc). In both cases, we concluded that a public school does not have a special relationship with a student that would require the school to protect the student from harm at the hands of a private actor.
In Walton v. Alexander, the student plaintiff attended the Mississippi School for the Deaf, a residential public school, and was sexually assaulted by a fellow student. 44 F.3d at 1299. The student plaintiff brought suit under § 1983, based upon the special relationship exception. Even though the school was a residential school, and thus responsible for fulfilling most of the students’ day-to-day needs, we held that the school had not created a special relationship with the student, because the student “attended [the] school voluntarily with the option of leaving at will.” Id. at 1305. In so holding, we “strictly” construed DeShaney and explained that it is “important to apply DeShaney as it is written.” Id. at 1303, 1305. *857 We reasoned, “DeShaney emphasize[d] ... that extending the Due Process Clause to impose on the state the obligation to defend and to pay for the acts of non-state third parties is a burden not supported by the text or history of the Clause, nor by general principles of constitutional jurisprudence.” Id. at 1305. We concluded that “[s]uch an expansion of the state’s liability for acts of third parties only can make constitutional sense ... when the state has effectively taken the plaintiffs liberty under terms that provide no realistic means of voluntarily terminating the state’s custody and which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety.” Id. (emphasis in original). It is only under these “extreme circumstances that the state itself, by its affirmative act and pursuant to its own will, has effectively used its power to force a ‘special relationship,’ with respect to which it assumes a certain liability.” Id.
We next addressed the special relationship exception in Doe v. Hillsboro Independent School District, where we likewise held that the exception did not apply in the context of a public school. 113 F.3d at 1415. The student plaintiff in that case was thirteen years old. She was “kept after school to do special work on her studies” and was sexually assaulted by a custodian (who was not alleged to have been acting under color of state law) when she was sent to an unoccupied area of the school to retrieve supplies for her teacher. Id. at 1414. We rejected the plaintiffs argument that a special relationship existed between the school and the student due to the fact that school attendance was required by state law, and declined “to hold that compulsory attendance laws alone create a special relationship giving rise to a constitutionally rooted duty of school officials to protect students from private actors.” Id. at 1415. We reasoned that “[t]he restrictions imposed by attendance laws upon students and their parents are not analogous to the restraints of prisons and mental institutions” because “[t]he custody is intermittent,” “the student returns home each day,” and “[pjarents remain the primary source for the basic needs of their children.” Id.
Numerous panel decisions have declined to recognize a special relationship between a public school and its students. See, e.g., Doe v. San Antonio Indep. Sch. Dist., 197 Fed.Appx. 296, 298-301 (5th Cir.2006) (finding no special relationship between a school and a fourteen-year-old special education student when the student was allowed to leave with her “uncle,” who later allegedly molested her); Teague v. Tex. City Indep. Sch. Dist., 185 Fed.Appx. 355, 357 (5th Cir.2006) (finding no special relationship between a school and an eighteen-year-old special education student who was sexually assaulted by another special education student); Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198, 199, 202-03 (5th Cir.1994) (finding no special relationship between a high school and a student shot and killed in the school hallway during the school day by a boy who was not a student but had gained access to the school); Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 522, 529 (5th Cir.1994) (finding no special relationship between a high school and a student fatally wounded by a gunshot fired in the school parking lot after a school dance).
We reaffirm, then, decades of binding precedent: a public school does not have a DeShaney special relationship with its students requiring the school to ensure the students’ safety from private actors. Public schools do not take students into custody and hold them there against their will in the same way that a state takes prisoners, involuntarily committed mental *858 health patients, and foster children into its custody. See DeShaney, 489 U.S. at 199-200, 109 S.Ct. 998; Griffith, 899 F.2d at 1439. Without a special relationship, a public school has no constitutional duty to ensure that its students are safe from private violence. That is not to say that schools have absolutely no duty to ensure that students are safe during the school day. Schools may have such a duty by virtue of a state’s tort or other laws. However, “[sjection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.” Baker v. McCollan, 443 U.S. 137, 146, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).
Like our court, each circuit to have addressed the issue has concluded that public schools do not have a special relationship with their students, as public schools do not place the same restraints on students’ liberty as do prisons and state mental health institutions. See, e.g., Hasenfus v. LaJeunesse, 175 F.3d 68, 69-72 (1st Cir. 1999) (fourteen-year-old student attempted suicide after being sent unsupervised to a locker room); D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1366, 1370-73 (3d Cir.1992) (en banc) (sixteen-year-old student was sexually assaulted by fellow students in a unisex bathroom and darkroom, both of which were part of a classroom where a teacher was present during the attacks); Stevenson ex rel. Stevenson v. Martin Cnty. Bd. of Educ., 3 Fed.Appx. 25, 27, 30-31 (4th Cir.2001) (ten-year-old student assaulted by his classmates); Doe v. Claiborne Cnty., Tenn., 103 F.3d 495, 500-01, 509-10 (6th Cir.1996) (fourteen-year-old student sexually assaulted by an athletic coach off school grounds); J.O. v. Alton Cmty. Unit Sch. Dist. 11, 909 F.2d 267, 268, 272-73 (7th Cir.1990) (teacher sexually molested two “school-age children”); Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729, 731-34 (8th Cir.1993) (intellectually disabled high school boy was sexually assaulted by another intellectually disabled student); Patel v. Kent Sch. Dist., 648 F.3d 965, 968-69, 972-74 (9th Cir.2011) (developmentally disabled high school student was sexually assaulted by a classmate when she was permitted to use restroom alone even though her parents specifically requested that she be under adult supervision at all times due to her disability); Maldonado v. Josey, 975 F.2d 727, 728, 729-33 (10th Cir.1992) (eleven-year-old boy died of accidental strangulation in an unsupervised cloakroom adjacent to his classroom during the school day); Wyke v. Polk Cnty. Sch. Bd., 129 F.3d 560, 563, 568-70 (11th Cir.1997) (thirteen-year-old boy committed suicide a few days after unsuccessful attempts at school and school officials never told his mother of the attempts).
3. No Special Relationship Exists Here
Against this backdrop, and the many decisions to the contrary, the Does (together with our dissenting colleagues) argue that Jane had a special relationship with her school, and therefore a substantive due process interest. They contend that compulsory school attendance laws, combined with Jane’s young age and the affirmative act of placing Jane into Keyes’s custody (what the Does describe as the Education Defendants’ “active, deliberatively indifferent, conduct”), created a special relationship in this case. None of these factors, however, provides a basis to conclude that the school assumed a constitutional duty to protect Jane. Instead, the Does’ argument ignores the contours of the special relationship exception to create a cause of action where none exists.
a. Jane’s Young Age
The Does (and the dissenters) rely largely upon Jane’s young age to distin *859 guish this case from the many others in which we have held that schools have no special relationship with their students. We do not find Jane’s age to be a relevant distinguishing characteristic for purposes of the special relationship analysis.[5]
Although it is true that in our prior cases we have dealt with children older than Jane, we have never relied upon the age of the student at issue to resolve the special relationship analysis. Rather, we have said that schools do not have a special relationship with students because “[parents remain the primary source for the basic needs of their children.” Hillsboro, 113 F.3d at 1415. This is as much true for elementary students as it is for high school students. No matter the age of the child, parents are the primary providers of food, clothing, shelter, medical care, and reasonable safety for their minor children. Thus, school children are returned to their parents’ care at the end of each day, and are able to seek assistance from their families on a daily basis, unlike those who are incarcerated or involuntarily committed.
Jane’s immaturity is insufficient to distinguish this case from our decisions in Walton and Hillsboro. The suggestion that we ought to examine an individual’s characteristics to determine whether the state has assumed a duty to care for that person is wholly unsupported by precedent. The situations in which the state assumes a duty of care sufficient to create a special relationship are strictly enumerated and the restrictions of each situation are identical. In the circumstances of incarceration, involuntary institutionalization, and foster care, the state has, through an established set of laws and procedures, rendered the person in its care completely unable to provide for his or her basic needs and it assumes a duty to provide for these needs. Neither the Supreme Court nor this court has ever suggested that anything less than such a total restriction is sufficient to create a special relationship with the state, regardless of the age or competence of the individual. See DeShaney, 489 U.S. at 200, 109 S.Ct. 998 (“The affirmative duty to protect arises not from the State’s knowledge of the individual’s predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.”).
Moreover, the focus upon Jane’s young age makes an essentially arbitrary distinction between the thirteen- and fourteen-year-old students in Walton and Hillsboro and nine-year-old students like Jane. If we were to accept this argument, schools *860 would be required to evaluate the maturity of each student to determine whether the school has a special relationship with that student. Indeed, some students could “age out” of constitutional protection over the course of one academic year. A constitutional duty to protect a student from harm does not depend on the maturity of the student, a factor not in the control of the state. Through their public school systems, states take on the responsibility of educating students, but, no matter the age of the student, public schools simply do not take on the responsibility of providing “food, clothing, shelter, medical care, and reasonable safety” for the students they educate. See DeShaney, 489 U.S. at 200, 109 S.Ct. 998.
Particularly instructive on this question is the Ninth Circuit’s recent decision in Patel v. Kent School District, 648 F.3d 965 (9th Cir.2011). There, a developmentally disabled student had several sexual encounters with a classmate in a restroom adjacent to her classroom. Id. at 968. The student’s parents had requested that she remain under adult supervision at all times because her disability prevented her from recognizing dangerous situations and caused her to act inappropriately with others. Id. at 968-70. Nevertheless, the student’s teacher allowed her to use the restroom alone in order to foster her development. Id. at 969. The Ninth Circuit held that compulsory school attendance laws do not create a special relationship between public schools and students that would require schools to protect the students from harm. Id. at 973-74. Of particular import to this case, the Ninth Circuit also rejected the student’s contention that the school was required to protect against her “special vulnerabilities.” Id. at 974. The court reasoned that “[i]n the case of a minor child, custody does not exist until the state has so restrained the child’s liberty that the parents cannot care for the child’s basic needs,” and the student’s disability did not prevent her parents from caring for her basic needs. Id. (citing DeShaney, 489 U.S. at 199-201, 109 S.Ct. 998). Under the Ninth Circuit’s reasoning, the existence of a special relationship does not depend on the characteristics of the individual. Consistent with Patel, we conclude that Jane’s young age and immaturity do not provide a basis for finding a special relationship with her school.
Our conclusion that no special relationship exists between nine-year-old Jane and her school is consistent with the decisions of our sister circuits, four of which have addressed cases involving children who were approximately the same age or even younger than Jane. See Allen v. Susquehanna Twp. Sch. Dist., 233 Fed.Appx. 149, 151-53 (3d Cir.2007) (finding no special relationship between school and developmentally disabled eleven-year-old student who left school grounds and was subsequently killed); Worthington v. Elmore Cnty. Bd. of Educ., 160 Fed.Appx. 877, 878, 881 (11th Cir.2005) (finding no special relationship between school and developmentally disabled seven-year-old student who was sexually assaulted by another student on a school bus); Stevenson, 3 Fed. Appx. at 30-31 (finding no special relationship between school and ten-year-old boy who had been beaten up repeatedly by bullies during the school day); Maldonado, 975 F.2d at 728, 731-33 (finding no special relationship between school and eleven-year-old boy who died of accidental strangulation in an unsupervised cloakroom adjacent to his classroom during the school day). While we should have every reason to expect that public schools can and will provide for the safety of public school students, no matter their age, our precedents, and the decisions of every other circuit to have considered this issue, *861 dictate that schools are simply not constitutionally required to ensure students’ safety from private actors. Despite her young age, Jane was not attending the school through the “affirmative exercise of [state] power,” DeShaney, 489 U.S. at 200, 109 S.Ct. 998; she was attending the school because her parents voluntarily chose to send her there (as one of several ways to fulfill their compulsory education obligations), and they remained responsible for her basic needs.[6]
b. Compulsory School Attendance Latvs
The Does also suggest that a special relationship exists because Jane’s attendance at school was mandated by compulsory attendance laws. We have specifically held, however, that compulsory school attendance laws do not “alone create a special relationship.” Hillsboro Indep. Sch. Dist., 113 F.3d at 1415.
There is no indication that Jane’s attendance at the school was somehow more compulsory as a nine-year-old than if she were a teenager. While it may be true that elementary school students are subject to more rules during the school day (a fact not pleaded), their attendance at school is no more or less mandatory than teenagers’ attendance. In fact, Jane was subject to exactly the same Mississippi compulsory education laws as was the plaintiff in Walton, who voluntarily attended a residential school for the deaf. Mississippi requires parents to enroll their children in school until age seventeen, and parents may fulfill this requirement in several ways, only one of which is to send their child to public school. Miss.Code Ann. § 37-13-91(3) (requiring that parent enroll compulsory school-age child in a public school, a “legitimate nonpublic school,” or provide a “legitimate home instruction program”). It may well be true that, for the vast majority of parents in Mississippi, the only way for them to fulfill their obligation is to enroll their children in public school. But that practicality does not alter the fact that Jane’s parents voluntarily sent her to the school as a means of fulfilling their obligation to educate her. Jane’s parents were free at any time to remove Jane from the school if they felt that her safety was being compromised. This reality is a far cry from the situation of incarcerated prisoners, institutionalized mental health patients, or children placed in foster care. Mississippi’s compulsory education law is therefore insufficient under our precedent to create a special relationship between the school and Jane, despite Jane’s young age.
c. Release of Jane to Keyes
As a final effort to distinguish this case from the many others in this area, the Does contend that the “active, deliberately indifferent, conduct” of school officials in releasing Jane to Keyes formed a special relationship. The dissent similarly argues that a special relationship was created when the school separated Jane from her *862 teachers and classmates and delivered her into Keyes’ exclusive custody. This argument, however, has several flaws.
Even assuming that the school had custody over Jane to the exclusion of her legal guardians, which it did not, the school did not knowingly transfer that custody to an unauthorized individual. The complaint alleges that the school employee releasing Jane committed an affirmative act, but does not assert that the school employee actually knew that Keyes was unauthorized to take Jane from school. Implicit in the Supreme Court’s holding that a state may create a special relationship through an “affirmative exercise of its power,” DeShaney, 489 U.S. at 200, 109 S.Ct. 998, is the requirement that the state actor know that he or she is restricting an individual’s liberty. When a state incarcerates a prisoner, institutionalizes a mental health patient, or places a child in foster care, the state knows that it has restricted the individual’s liberty and rendered him unable to care for his basic human needs. When a school employee carelessly fails to ensure that an adult is authorized to take an elementary student from the school, no state actor has knowledge that the school has thereby restricted the student’s liberty, because the adult taking the student from school may or may not be authorized.
The Does’ (and the dissent’s) theory also suggests that the same act that creates the special relationship can also violate the duty of care owed to the student. Under the special relationship exception, the state assumes a duty to care for and protect an individual. Once the special relationship is created, it is the failure to fulfill that duty that gives rise to a constitutional violation. An allegation of deliberate indifference may be sufficient to violate a constitutional duty, but it is not sufficient to create the constitutional duty. Furthermore, this theory suggests that the school’s very act of releasing Jane into the custody of a private actor somehow created the state custody that is necessary for a DeShaney special relationship to exist in the first place. Such a theory is wholly inconsistent with DeShaney itself. 489 U.S. at 199-200, 109 S.Ct. 998 (“[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.”) (emphasis added).
The Tenth Circuit in Graham v. Independent School District No. 1-89, 22 F.3d 991 (10th Cir.1994), rejected an argument similar to the one the Does raise here. In that case, Graham brought suit under Section 1983 against a school district after certain students shot and killed her son on school property during the school day.[7] Graham alleged that the school knew that her child was in danger of being harmed, but failed to take appropriate protective measures. Id. at 993. The plaintiffs argued that the school’s “knowledge of the violent propensities of one of its students ... coupled with the quasi-custodial nature of school attendance, satisfies the standards articulated in DeShaney.” Id. at 994. The court rejected this argument, holding that “foreseeability cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship.” Id. The court concluded:
[ijnaction by the state in the face of a known danger is not enough to trigger the obligation; according to DeShaney the state must have limited in some way *863 the liberty of a citizen to act on his own behalf. In the absence of a custodial relationship, we believe plaintiffs cannot state a constitutional claim based upon the defendants’ alleged knowledge of dangerous circumstances.
Id. at 995 (citation and internal quotation marks omitted). Thus, the state’s failure to protect the student from private harm (even if foreseeable) did not give rise to a constitutional claim in the absence of a finding that a custodial relationship already existed.
The Does point us to no distinguishing characteristics of this case that are sufficient to give rise to a DeShaney special relationship between Jane and her school. This case is ultimately no different than Walton and Hillsboro, and thus requires the same outcome.
4. Conclusion
The question posed to us is whether Jane’s school, through its affirmative exercise of state power, assumed a constitutional duty to protect Jane from a private actor. We are compelled by our precedent, and by the Supreme Court’s guidance in DeShaney, to conclude that the school did not assume that duty. The district court correctly held that the Does have failed to state a claim under § 1983 for a constitutional violation under the special relationship exception.
Because we find no special relationship, we do not address whether the school’s alleged actions in releasing Jane to Keyes amounted to “deliberate indifference.” As this en banc court previously explained in McClendon v. City of Columbia, 305 F.3d 314 (5th Cir.2002), only where a state first creates a special relationship with an individual does the state then have “a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence.” Id. at 324; see also Walton, 44 F.3d at 1300-01 (explaining that if a state creates a special relationship with an individual, it will then owe “some duty — arising under the Due Process Clause of the Fourteenth Amendment to the United States Constitution — to protect [the individual’s] bodily integrity from third party non-state actors.”). Without a special relationship, the school had no constitutional duty to protect Jane from private actors such as Keyes, and the question of its alleged deliberate indifference is simply immaterial.
Having concluded that the school had no special relationship with Jane that imposed on the school a constitutional duty to protect her from private harm, we now turn to the Does’ remaining theories of liability.

B. State-Created Danger

The Does argue that they have stated a viable constitutional claim under the so-called “state-created” danger theory of liability. We find no such viable claim.
After DeShaney, many circuits[8] used the following language in the Court’s opinion to provide an alternative basis for § 1983 liability for harm inflicted by private actors:
While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary cus *864 tody of Joshua does not alter the analysis, for when it returned him to his father’s custody, it placed him in no worse position than that in which he would have been had it not acted at all
DeShaney, 489 U.S. at 201, 109 S.Ct. 998 (emphases added). Under the state-created danger theory, a state actor may be liable under § 1983 if the state actor created or knew of a dangerous situation and affirmatively placed the plaintiff in that situation. See, e.g., Carlton v. Cleburne Cnty., 93 F.3d 505, 508 (8th Cir.1996) (“In [the state-created danger] cases the courts have uniformly held that state actors may be liable if they affirmatively created the plaintiffs’ peril or acted to render them more vulnerable to danger. In other words, the individuals would not have been in harm’s way but for the government’s affirmative actions.”) (citation omitted). In Wood v. Ostrander, 879 F.2d 583, 586 (9th Cir.1989), the Ninth Circuit adopted the state-created danger theory in the context of a § 1983 claim brought against police officers by the passenger of an impounded vehicle, who was raped after officers abandoned her on the side of a road in a high crime area in the early morning hours. Id. at 586, 588-90. Similarly, in Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996), the Third Circuit adopted the state-created danger theory in the context of a lawsuit brought against a city and several police officers on behalf of a woman who suffered extensive brain damage when the officers allegedly sent her home “unescorted in a seriously intoxicated state in cold weather.” Id. at 1208-09.[9]
Unlike many of our sister circuits, we have never explicitly adopted the state-created danger theory. See, e.g., McClendon, 305 F.3d at 325. The district court in this case acknowledged our precedent, but held that even if the theory were recognized, the Does had failed to plead facts that would amount to a constitutional violation. The court held that the Does did not contend that the Education Defendants knew that their policy would allow Jane to be checked out of school by an unauthorized adult and sexually assaulted; therefore, the Does had not alleged that the Defendants were deliberately indifferent to a known danger.
The Does contend that this circuit has in fact adopted and applied the state-created danger theory in light of our decisions in Scanlan v. Texas A&M University, 343 F.3d 533 (5th Cir.2003), and Breen v. Texas A&M University, 485 F.3d 325 (5th Cir.2007), which arose out of the 1999 bonfire collapse at Texas A&M University. In Scanlan, the panel considered the allegations and stated that the “district court should have concluded that the plaintiffs stated a section 1983 claim under the *865 state-created danger theory.” 343 F.3d at 538. Despite this statement, subsequent panels have concluded that Scanlan did not in fact adopt the state-created danger theory. In Rivera v. Houston Independent School District, 349 F.3d 244 (5th Cir.2003), for example, we explained that while Scanlan remanded the “case to the district court for further proceedings, [it] did not recognize the state created danger theory.” Id. at 249 n. 5; see also Rios v. City of Del Rio, Tex., 444 F.3d 417, 422-23 (5th Cir.2006) (“[NJowhere in the [Scanlan] opinion does the court expressly purport to adopt or approve th[e] [state-created danger] theory.”). This understanding was complicated somewhat by our decision in Breen, where a panel of this court again interpreted Scanlan. 485 F.3d at 336. The Breen panel concluded that “[t]he Scanlan panel’s clearly implied recognition of state-created danger as a valid legal theory applicable to the case is the law of the case with respect to these further appeals in these same cases now before this panel.” Id. The panel, however, subsequently withdrew this portion of the opinion. Breen v. Tex. A&M Univ., 494 F.3d 516, 518 (5th Cir.2007). Despite the potential confusion created by Scanlan and Breen, recent decisions have consistently confirmed that “[t]he Fifth Circuit has not adopted the ‘state-created danger’ theory of liability.” Kovacic v. Villarreal, 628 F.3d 209, 214 (5th Cir.2010); see also Bustos v. Martini Club, Inc., 599 F.3d 458, 466 (5th Cir.2010) (“[T]his circuit has not adopted the state-created danger theory.”).
We decline to use this en banc opportunity to adopt the state-created danger theory in this case because the allegations would not support such a theory. Although we have not recognized the theory, we have stated the elements that such a cause of action would require. The Scanlan panel explained that the state-created danger theory requires “a plaintiff [to] show [1] the defendants used their authority to create a dangerous environment for the plaintiff and [2] that the defendants acted with deliberate indifference to the plight of the plaintiff.” Scanlan, 343 F.3d at 537-38. To establish deliberate indifference for purposes of state-created danger, the plaintiff must show that “[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and ... they must have used their authority to create an opportunity that would not otherwise have existed for the third party’s crime to occur.” Piotrowski v. City of Houston, 237 F.3d 567, 585 (5th Cir.2001) (citation and internal quotation marks omitted); see also McClendon, 305 F.3d at 326 n. 8 (“To act with deliberate indifference, a state actor must know of and disregard an excessive risk to the victim’s health or safety.”) (internal quotation marks and alterations omitted). Critically, this court has explained that the “state-created danger theory is inapposite without a known victim.” Rios, 444 F.3d at 424 (citation and internal quotation marks omitted); see also Lester v. City of Coll. Station, 103 Fed.Appx. 814, 815-16 (5th Cir.2004) (“[E]ven if it is assumed that the state-created-danger theory applies, liability exists only if the state actor is aware of an immediate danger facing a known victim.”) (citing Saenz v. Heldenfels Bros., Inc., 183 F.3d 389, 392 (5th Cir.1999)) (emphasis added).
In support of their state-created danger claim, the Does allege that school officials “received complaints and inquiries and/or had internal discussions and safety meetings concerning checkout policies and procedures and access to students under their care and control by unauthorized individuals,” and they therefore “had actual knowledge of the dangers created by their policies, customs and regulations, but they *866 failed to take corrective action to reduce or prevent the danger.” According to the Does, the school’s failure to adopt a stricter policy amounted to “deliberate indifference.” Nevertheless, the Does’ allegations cannot make out a state-created danger claim, as they do not demonstrate the existence of “an immediate danger facing a known victim.” Saenz, 183 F.3d at 392. At most, the Does allege that the school was aware of some general deficiencies in the check-out policy. They do not allege that the school knew about an immediate danger to Jane’s safety, nor can the court infer such knowledge from the pleadings. Without such allegations, even if we were to embrace the state-created danger theory, the claim would necessarily fail.
We have consistently cautioned against finding liability under the state-created danger theory based upon an ineffective policy or practice in cases where the plaintiffs injury is inflicted by a private actor. In Rivera v. Houston Independent School District, for example, we rejected a state-created danger claim against a school after a student died as a result of gang-related violence, and explained:
[T]o hold HISD responsible for the ultimate ineffectiveness of [its policies designed to combat gang violence] would turn the Due Process Clause’s limited duty of care and protection into a guarantee of shelter from private violence. This result would be inimical to the Supreme Court’s conclusion [in DeShaney] that the Due Process Clause does not require the State to protect individuals from private violence.
349 F.3d at 250; see also Doe v. Hillsboro Indep. Sch. Dist., 113 F.3d 1412, 1415 (5th Cir.1997) (finding no viable state-created danger claim in case where student was raped by a school custodian with no known criminal history, and explaining that a “post hoc attribution of known danger would turn inside out this limited exception to the principle of no duty”). We conclude that the Does’ allegations do not support a claim under the state-created danger theory, even if that theory were viable in this circuit.

C. Municipal Liability

Finally, the Does maintain that they have stated a viable claim under what they describe as a “pure” municipal liability theory. They argue that municipal liability is available under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), because the school promulgated a policy — the ineffective student check-out policy — that was the moving force behind Jane’s injury. We disagree.[10]
A claim of municipal liability under Section 1983 “requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose ‘moving force’ is the policy or custom.” Piotrowski, 237 F.3d at 578 (citing Monell, 436 U.S. at 694, 98 S.Ct. 2018).[11] We have stated time and again *867 that “[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing.” Becerra v. Asher, 105 F.3d 1042, 1048 (5th Cir.1997); see also Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (“[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiffs harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.”). Thus, even if the ineffective check-out policy was the moving force behind Jane’s injury, there can be no § 1983 liability unless Jane suffered a constitutional violation. Jane did not suffer a constitutional violation at the hands of Keyes because Keyes is not a state actor. The only state actions that could give rise to a constitutional violation in this case are the school’s failure to prevent Keyes from injuring Jane or the act of releasing Jane to Keyes. As explained above, these state actions are insufficient for purposes of the special relationship and state-created danger theories. The Does now contend that they have alleged a constitutional violation because the school’s conduct shocks the conscience.
The Supreme Court recognized the shocks the conscience standard in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). There, the Court found a violation of Rochin’s substantive due process rights after police officers who had arrested Rochin ordered doctors to pump Rochin’s stomach to induce him to vomit two capsules of morphine that he had previously swallowed. Id. at 166, 72 S.Ct. 205. The Court determined that the state’s conduct “shock[ed] the conscience,” and therefore violated Rochin’s due process rights. Id. at 172, 72 S.Ct. 205. Later, in County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Supreme Court explained that substantive due process is violated by executive action “only when it ‘can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.’ ” Id. at 847, 118 S.Ct. 1708 (quoting Collins v. City of Harker Heights, Tex., 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Lewis Court found that a police officer’s deliberate indifference during a high-speed chase that caused the death of a motorcyclist did not “shock the conscience,” but left open the possibility that unauthorized law enforcement behavior in other contexts might “shock the conscience” and give rise to § 1983 liability. Id. at 836-37, 850, 854, 118 S.Ct. 1708; see Chavez v. Martinez, 538 U.S. 760, 774, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003).
Conduct sufficient to shock the conscience for substantive due process purposes has been described in several different ways. It has been described as conduct that “violates the decencies of civilized conduct”; conduct that is “so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency”; conduct that “interferes with rights implicit in the concept of ordered liberty”; and conduct that “is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.” Lewis, 523 U.S. at 846-47 & n. 8, 118 S.Ct. 1708 (citation and internal quotation marks omitted). Many cases that have applied the standard have in *868 volved the use of extreme force by police officers or other state actors. See Checki v. Webb, 785 F.2d 534, 535-36, 538 (5th Cir.1986) (state trooper intentionally used his vehicle to terrorize motorist and passenger); Shillingford v. Holmes, 634 F.2d 263, 264-65 (5th Cir.1981) (police officer intentionally struck tourist because he was photographing the police officer and fellow officers apprehending a boy on the street during a Mardi Gras parade), abrogated on other grounds by Valencia v. Wiggins, 981 F.2d 1440 (5th Cir.1993); see also Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ., 229 F.3d 1069, 1071, 1075-76 (11th Cir.2000) (student blinded in one eye when a coach intentionally hit him in the head with a metal weight); Rogers v. City of Little Rock, Ark., 152 F.3d 790, 797 (8th Cir.1998) (rape of a woman at her house by a police officer after he stopped her for a traffic violation); Hemphill v. Schott, 141 F.3d 412, 418-19 (2d Cir.1998) (police officer provided assistance to a third party in shooting the plaintiff). As one court has recently summarized, “[t]he burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme.” J.R. v. Gloria, 593 F.3d 73, 80 (1st Cir.2010) (citation and internal quotation marks omitted).
We find that the Does’ attempt to employ the shocks the conscience standard is unsuccessful for two reasons. First, the only state action at issue here is the adoption and implementation of an allegedly deficient policy, which allowed school employees to release Jane to Keyes without verifying his identification or his right to take Jane from the school. We conclude that the implementation and execution of such a policy does not, on its own, shock the conscience, particularly when compared to those cases detailed above in which that standard has been successfully applied. See, e.g., Checki, 785 F.2d at 538; Shillingford, 634 F.2d at 265. The policy simply does not fall within the category of conduct that “is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.” Lewis, 523 U.S. at 847 n. 8, 118 S.Ct. 1708. Far from a policy that shocks the conscience, the check-out policy at issue here appears to be relatively common and to have some logical basis, particularly in small communities such as Covington County, Mississippi.[12] The mere fact that Keyes exploited the check-out system to gain access to Jane does not mean that the school’s adoption and implementation of the policy shocks the conscience.
Second, we must be careful not to read the Rochin shocks the conscience standard as a separate exception to the DeShaney principle. The actual harm inflicted upon Jane in this case was caused by private actor Tommy Keyes, and after DeShaney, the state cannot be held constitutionally liable for its “failure to protect an individu *869 al against private violence,” save for the special relationship theory and, in some circuits, the state-created danger theory. DeShaney, 489 U.S. at 197, 109 S.Ct. 998. To allow the Does to proceed on a shocks the conscience theory without first demonstrating a constitutional duty to protect would be wholly inconsistent with DeShaney. In fact, the DeShaney Court itself rejected a similar argument. There, the petitioners had argued that a special relationship existed between the state and young Joshua DeShaney, such that the state had a duty to protect him from his father’s violence. Id. The state’s failure to discharge that duty, the petitioners argued, was an “abuse of governmental power that so ‘shocks the conscience,’ as to constitute a substantive due process violation.” Id. (citing Rochin, 342 U.S. at 172, 72 S.Ct. 205). The Court rejected this argument because it concluded that no special relationship existed between Joshua DeShaney and the state. Id. at 198, 109 S.Ct. 998.
As we conclude that the school’s adoption and implementation of its checkout policy does not itself shock the conscience, a constitutional claim on this basis necessarily fails. Moreover, as we have found that Jane has not alleged an underlying constitutional violation (under either the special relationship theory or the purported state-created danger theory), there is no other potential basis for municipal liability. Becerra, 105 F.3d at 1048 (“Without an underlying constitutional violation, an essential element of municipal liability is missing.”). We therefore reject the Does’ municipal liability argument.[13]

D. Qualified Immunity

The district court held in the alternative that, even if the Does had stated a constitutional claim, the Education Defendants sued in their individual capacities were entitled to qualified immunity, because any right to governmental protection based upon a special relationship between Jane and her school was not clearly established at the time that Jane was victimized.
Although no longer mandated as a first step in the qualified immunity analysis, one part of this analysis requires us to “decide whether the facts that a plaintiff has alleged ... make out a violation of a constitutional right.” Pearson v. Callahan, 555 U.S. 223, 232, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Because we determine that the Does have failed to state a violation of Jane’s constitutional rights, we need not further consider the qualified immunity analysis.[14]
IV. CONCLUSION
In affirming the dismissal of the Does’ complaint, we do not suggest that schools have no obligation to insure that their *870 students remain safe from acts of private violence. State law provides the appropriate legal framework to address Jane’s injury. The question we have addressed is simply whether the school’s failure to check Keyes’s identity and be certain that he was authorized to take Jane amounted to a constitutional violation. Supreme Court precedent, our precedent, and the decisions of every other circuit to address the special relationship exception compel this court to conclude that it does not. In addition, neither the state-created danger theory nor municipal liability provides a viable basis for recovery.
For these reasons, the judgment of the district court is AFFIRMED.

. The incidents occurred on September 12, September 27, October 12, November 6, December 11, 2007, and January 8, 2008.

. As discussed further herein, the limited right to state protection from private violence arises out of the substantive due process component of the Fourteenth Amendment, not equal protection or procedural due process. See DeShaney v. Winnebago Cnty. Dep’t of Social Servs., 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("In the substantive due process analysis, it is the State’s affirmative act of restraining the individual’s freedom to act on his own behalf ... which is the ‘deprivation of liberty’ triggering the protections of the Due Process Clause ...."); Walton v. Alexander, 44 F.3d 1297, 1302-03 (5th Cir. 1995) (en banc). We therefore ana *854 lyze Jane’s cause of action as a substantive due process claim.

. Jane does not, and indeed cannot, state a substantive due process claim based upon the sexual molestation itself. Although we recognized a constitutional right to bodily integrity in Doe v. Taylor Independent School District, 15 F.3d 443 (5th Cir.1994) (en banc), we found that this right is "necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment.” Id. at 451-52 (emphasis added). Taylor is inapplicable here because the actual violation of Jane's bodily integrity was caused by Keyes, a non-state actor.

. Several courts of appeals have recognized a second limited exception, the so-called "state- *856 created danger” theory. We address this theory below.

. The Does (and our dissenting colleagues) contort a statement made by the Supreme Court in a wholly different context in Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), into a suggestion that the Court would find a special relationship in this case. Addressing claims brought by a group of students alleging that corporal punishment in public schools was prohibited by the Eighth Amendment, the Court stated that "[t]he schoolchild has little need for the protections of the Eighth Amendment” because "the public school remains an open institution,” and “[e]xcept perhaps when very young, [a] child is not physically restrained from leaving school during school hours.” Id. at 670, 97 S.Ct. 1401. The Court then listed a number of reasons why schools are open institutions. Yet the Court did not suggest that a public school is no less an open institution if a student is restrained from freely leaving the school due to her young age or if a student is apart from teachers or other students, whether on campus or off. Indeed, in an opinion written far more recently than Ingraham, the Court explicitly stated in dicta that its opinions should not be read to "suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional ‘duty to protect.' ” Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (citing DeShaney, 489 U.S. at 200, 109 S.Ct. 998).

. Although it is true that Jane’s guardians were less able to protect Jane during the school day, this fact exists to some extent in every alleged special relationship case involving injuries that occurred at school. See, e.g., Patel, 648 F.3d at 969-70; Hasenfus, 175 F.3d at 70-71; Middle Bucks, 972 F.2d at 1366; Maldonado, 975 F.2d at 728, 732-33; see also Stevenson, 3 Fed.Appx. at 27-28. This fact has never been found to create a special relationship, as the parents remain the primary caregivers, and the child can turn to his or her parents for help on a daily basis. See Middle Bucks, 972 F.2d at 1372 ("D.R.’s complaint alleges an ongoing series of assaults and abuse over a period of months. Although these acts allegedly took place during the school day, D.R. could, and did, leave the school building every day. The state did nothing to restrict her liberty after school hours and thus did not deny her meaningful access to sources of help.”).

. The appeal was considered jointly with another suit, which was brought by the mother of a student who was stabbed on school premises. Graham, 22 F.3d at 993.

. See, e.g., Lombardi v. Whitman, 485 F.3d 73, 80 (2d Cir.2007); Kneipp v. Tedder, 95 F.3d 1199, 1211 (3d Cir. 1996); Kallstrom v. City of Columbus, 136 F.3d 1055, 1066-67 (6th Cir. 1998); Jackson v. Indian Prairie Sch. Dist. 204, 653 F.3d 647, 654 (7th Cir.2011); Carlton v. Cleburne Cnty., 93 F.3d 505, 508 (8th Cir. 1996); Wood v. Ostrander, 879 F.2d 583, 589-90 (9th Cir. 1989); Uhlrig v. Harder, 64 F.3d 567, 572-73 (10th Cir.1995).

. Our sister circuits have since set out various multi-factor tests related to the state-created danger theory. The Seventh Circuit, for example, has developed a three-part test. See Jackson, 653 F.3d at 654 (“To establish a substantive due process claim under a state-created danger theory, [the plaintiff] must demonstrate that: (1) the district, by its affirmative acts, created or increased a danger that [the plaintiff] faced; (2) the district’s failure to protect [the plaintiff] from danger was the proximate cause of her injuries; and (3) the district’s failure to protect her 'shocks the conscience.' ”). The Sixth Circuit has laid out a similar three-factor test. See Estate of Smithers ex rel. Norris v. City of Flint, 602 F.3d 758, 763 (6th Cir.2010) (“A state-created danger claim has three elements: (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state’s actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.”).

. The Does also contend that the district court erred in applying a heightened pleading standard to their municipal liability claim, in violation of Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). That contention fails. Fairly read, the district court applied the Twombly and Iqbal standards in this case.

. We have, of course, recognized that § 1983 municipal liability can also exist if "[t]he official policy itself [is] unconstitutional.” James v. Harris Cnty., 577 F.3d 612, 617 (5th Cir.2009); Johnson v. Deep E. Tex. Reg’l Narcotics Trafficking Task Force, 379 F.3d 293, 309 (5th Cir.2004) ("For a municipality to be liable on account of its policy, the plaintiff must show, among other things, either (1) that the policy itself violated federal law or authorized or directed the deprivation of fed *867 eral rights or (2) that the policy was adopted or maintained by the municipality’s policymakers 'with "deliberate indifference” as to its known or obvious consequences ....’”) (quoting Bd. of Cnty. Comm’rs of Bryan Cnty. v. Brown, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). Jane’s claim, however, rests upon deliberate indifference, and she does not allege that the school's policy itself violates the Constitution.

. Amici curiae the National School Boards Association, the Texas Association of School Boards Legal Assistance Fund, and the Mississippi School Boards Association argue, "a [check out] policy that allows for the exercise of professional judgment and discretion is not inherently dangerous .... In some communities, particularly those with small campus enrollments, school personnel often know parents, grandparents, babysitters, and other visitors by sight.” They further maintain that "[a]n ironclad rule precluding any exercise of discretion would prevent the release of children to parents and guardians who have lost or forgotten their identification ..., and it would prevent the release of children in circumstances in which the legal guardian is unavailable .... ” We need not address those arguments.

. The Does also attempt to impose supervisory liability on a failure to train or supervise theory. Nevertheless, this theory still requires the violation of an underlying constitutional right, which is lacking here. See City of Canton v. Harris, 489 U.S. 378, 386-90, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 254 (5th Cir.2005) ("[Supervisors may be liable for constitutional violations committed by subordinate employees when supervisors act, or fail to act, with deliberate indifference to violations of others’ constitutional rights committed by their subordinates.”) (emphasis omitted); see also Jenkins v. Bartlett, 487 F.3d 482, 492 (7th Cir.2007) ("[T]here can be no liability under Monell for failure to train when there is no violation of the plaintiff's constitutional rights.”).

. Upon dismissal of the Does’ constitutional claim, the district court also declined to exercise supplemental jurisdiction over their remaining state law claims, and dismissed those claims without prejudice, consistent with 28 U.S.C. § 1367(c)(3). The Does do not appeal this dismissal.