# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-00318-SCT

*THE CITY OF JACKSON, MISSISSIPPI*

*v.*

*MELANIE JOHNSON AND PAMELA HARRION,*
*INDIVIDUALLY AS NEXT FRIENDS OF MONICA*
*HARRION, KARLA LEWIS, SAMUEL HARRION,*
*JR. AND ANGELA HARRION, COLLECTIVELY*
*BEING THE WRONGFUL DEATH*
*BENEFICIARIES OF RUTH HELEN HARRION*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2020 |
| TRIAL JUDGE: | HON. ADRIENNE ANNETT HOOPER-WOOTEN |
| TRIAL COURT ATTORNEYS: | DENNIS C. SWEET, III |
| | DENNIS CHARLES SWEET, IV |
| | EDUARDO ALBERTO FLECHAS |
| | E. CLAIRE BARKER |
| | GAIL WRIGHT LOWERY |
| | LASHUNDRA JACKSON-WINTERS |
| | JAMES RICHARD DAVIS, JR. |
| | GREGORY RONELL BURNETT |
| | JAMES ANDERSON, JR. |
| COURT FROM WHICH APPEALED: | CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY |
| ATTORNEYS FOR APPELLANT: | JAMES RICHARD DAVIS, JR. |
| | LEE DAVIS THAMES, JR. |
| | JAMES ANDERSON, JR. |
| | LASHUNDRA JACKSON-WINTERS |
| ATTORNEYS FOR APPELLEES: | DENNIS C. SWEET, III |
| | DENNIS CHARLES SWEET, IV |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 04/28/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. In the early morning hours of July 15, 2014, Alonzo Stewart broke into the home of Ruth Helen Harrion where he brutally raped and murdered her. Shortly before the attack, Harrion had called 911 and reported that a prowler was around her home in Jackson, Mississippi. The 911 dispatcher did not instruct her to remain on the line as required by the City of Jackson's written policies and procedures. Two City of Jackson police officers responded to the residence and conducted a perimeter check, but they did not detect that the prowler had entered through a window. After failing to make contact with Ruth Harrion, they left. Her body was discovered by one of her adult children the next day.

¶2. Melanie Johnson and Ruth Harrion's other wrongful death beneficiaries (Johnson) sued the City of Jackson, the 911 operator, and the investigating officers. Johnson asserted claims under 42 U.S.C. § 1983 and under the Mississippi Tort Claims Act (MTCA). The trial court granted summary judgment to the 911 operator and to the officers on the ground of qualified immunity, but it denied summary judgment to the City. The § 1983 case was tried before a jury and, simultaneously, the MTCA case was tried before the bench. The jury found that the City had violated Ruth Harrion's constitutional due process rights under § 1983 and awarded $1 million in damages. The trial court awarded $500,000 in damages under the MTCA.

¶3. The City appeals, arguing that no genuine issues of material fact existed on Johnson's § 1983 claim and that it was entitled to a directed verdict on that claim. The City argues also

that the trial court erroneously allowed an expert to testify about Stewart's out-of-court statements and that the trial court erroneously found for Johnson on the MTCA claims because Johnson had failed to show that the City was not immune from suit.

¶4.    We hold that the City was entitled to a directed verdict on Johnson's § 1983 claim. Because due process does not require municipalities to protect their citizens from acts of private violence, Johnson was unable to show that the City violated Ruth Harrion's constitutional right to due process under § 1983. We affirm the trial court's finding the City liable under the MTCA.

**FACTS**

¶5.    Sixty-seven-year-old Ruth Harrion lived alone. At 3:23 a.m. on July 15, 2014, she called the City of Jackson's 911 emergency call center. Debra Goldman, a shift supervisor with the Jackson Police Department (JPD), answered the call. As a shift supervisor, Goldman was responsible for following applicable policies and procedures and making sure her subordinates followed those procedures. According to the City's Public Safety Communications Operating Procedures Manual, for emergency calls of this type, "the caller will be kept on the line whenever possible." For prowler calls specifically, "the call-taker/dispatcher shall determine whether the prowler was seen or heard, as well as his last known location. If possible, the caller should remain on the telephone, out of direct view, providing updated information until an officer arrives at the scene." Goldman testified that those policies and procedures applied to how she was supposed to handle Ruth Harrion's call.

3

¶6.     When Goldman answered Ruth Harrion's call, Harrion said, "I have a prowler around my house." Goldman asked for her name and, after Harrion provided her name, Goldman said, "we'll send the police." Then, the call was disconnected. It is disputed which party hung up first. Undisputed and likewise shown by a recording of the call is that Goldman made no attempt to keep Ruth Harrion on the line until the police arrived. Nor did she attempt to determine the prowler's location or whether Harrion had seen or heard the prowler. Goldman explained that the purpose of the call-taking policies is to save lives and that she was supposed to follow the policies but that she did not follow the policies in this instance. Goldman testified that, because Ruth Harrion's call reported a felony in progress, she dispatched the call as a "priority one" call, the highest priority.

¶7.     Tammie Heard and Derrick Evans were the police officers dispatched to Ruth Harrion's home at 3:28 a.m. Evans did not testify. Heard testified that Evans arrived two and a half to three minutes after the dispatch, and that she, Heard, arrived about four minutes after the dispatch. When Heard arrived, Evans was checking the house. The two officers walked all the way down both sides of the house together until they came to the backyard fence. The fence enclosing the backyard was approximately six feet high on one side and three to four feet high on the other side. Heard testified that an unwritten City of Jackson policy prevents police officers from going over a fence unless they are chasing a felon or someone is in distress. Therefore, Heard testified, they did not cross over the fence, but instead shined flashlights into the backyard and looked around. After they checked around the house and observed no signs of forced entry, they knocked on the front door, but no one

4

answered, and they heard nothing out of the ordinary. Evans asked dispatch to call Ruth Harrion's telephone, and the officers heard the telephone ringing from inside the house. The officers checked the license plate on a vehicle parked in the driveway and learned that the vehicle belonged to Ruth Harrion's relative. Then, Officer Heard cleared the call as "unable to locate." Officer Evans was cleared to go on a meal break. Before going back into service, Heard patrolled the neighborhood in her car but saw nothing out of the ordinary.

¶8.     Heard testified that she learned later that the perpetrator, Alonzo Stewart,[1] had been inside holding Harrion hostage while she and Evans were investigating outside. Harrion's body was found later that day outside her home. Detective Kevin McNeill responded to the crime scene. He determined that Stewart had pushed the burglar bars off a bedroom window and had used an overturned recycling bin to climb into Harrion's home through the window. The window was located inside the fence that Heard and Evans had declined to cross. McNeill observed that the window where Stewart had entered was ajar and that the recycling bin was underneath it. Marks were visible where the burglar bars had been pushed in. McNeill testified that the overturned recycling bin was clearly visible from the fence.

¶9.     According to the autopsy report, Ruth Harrion had been severely beaten, raped, and strangled, and she sustained a fatal gunshot wound to the left eye. The murder weapon was a .32 caliber revolver that Ruth Harrion had kept for self-defense. Evidence established that she had fired one shot at Stewart but missed; then he took the gun from her, ultimately using

---

[1] Stewart has been adjudicated mentally incompetent to stand trial for Harrion's murder.

5

it to kill her. The murder weapon was recovered from a creek bank after Stewart gave a confession to the police describing its whereabouts.

¶10. JPD's General Order 600-4 provides that "[t]he first officer on the scene . . . shall: Determine the nature of the problem and take appropriate action." The general order provides also that "[t]he primary responsibility of officers responding to an emergency situation is to identify the problem and participants, protect life and property, secure the crime scene, notify and deploy necessary support personnel, establish communications with the situation, restore and maintain order." Johnson sought to show at trial that Evans and Heard had violated this policy by not forcing entry into Ruth Harrion's home when she failed to answer the door or the phone call from dispatch. Further, Johnson sought to show that the officers had violated the policy by failing to discover that Stewart had gained entry by removing burglar bars from a window and by placing a recycling bin underneath it.

¶11. Officer Heard testified that she had seen the window in question but that no sign of forced entry had been present at that time. She testified that, if she and Evans had known that the perpetrator was inside, they would have forced their way into the house. According to Heard, Ruth Harrion's prowler call had seemed no different from others she had investigated. She testified that prowler calls all are handled the same way. When the police arrive, they check the grounds and make sure there are no signs of forced entry. They will advise dispatch if the home is secure or if there is a locked fence. They ask dispatch to contact the complainant. She testified that it is not mandatory for police to make contact with someone

6

who has called to report a prowler and that, commonly, residents do not come to the door when the police arrive.

¶12. Heard testified that, if there had been any sign that someone had broken into Ruth Harrion's home, she and Evans would have forced their way inside. But she said that, without any sign that a prowler is inside, the police cannot force entry into a house in response to a prowler call. She testified that they would have called a supervisor only in response to an actual crime scene, such as a homicide or a rape. Heard testified that if the police cannot get in, they call the fire department to make a forced entry. She reiterated that officers are trained not to go over a fence unless they are chasing someone.

¶13. Johnson presented expert testimony regarding the actions and inactions of the 911 dispatcher and officers. Michael Levine was accepted as an expert witness in the areas of police policy and procedures, police training and supervision, and police department compliance with policies and procedures. Levine testified that he had reviewed the full police file, listened to Stewart's audio statement describing the crime, and visited Ruth Harrion's home. The City objected to Levine's testimony about Stewart's confession, but the trial court overruled the objection. Levine testified that Stewart had said in his confession that he had been inside the house holding Ruth Harrion at gunpoint when the police were walking around outside. He opined to a reasonable degree of professional certainty that Stewart had been inside when the officers were investigating. Therefore, the officers had missed signs that Stewart had breached the premises, such as the recycling bin underneath the window. Levine testified that the officers should have observed the signs of a break-in and forced their way

7

inside, which would have saved Ruth Harrion's life. Levine had never heard of a policy preventing officers from jumping a fence. Further, he testified that the officers should not have left the scene without having made contact with Ruth Harrion because she was an elderly woman who had called to report a prowler. Levine opined that exigent circumstances were present that would have allowed the police to break into the house. He testified that a supervisor should have been monitoring what was going on to make sure the officers made contact with Ruth Harrion before clearing the call. Further, Levine testified that Goldman should have kept Ruth Harrion on the telephone until the officers arrived and that Goldman's failure to adhere to the call-taking policy demonstrated reckless indifference to Ruth Harrion's life. Levine testified to a reasonable degree of professional certainty that Goldman, Evans, and Heard had violated applicable policies and had acted in reckless disregard of Ruth Harrion's life and safety and that their actions evinced a lack of proper training and supervision. Because Ruth Harrion had called the police for help, he testified, Fourth Amendment concerns about the forced entry by police into her home were diminished.

¶14. The trial court accepted Tyrone Lewis, a retired deputy police chief with JPD and a former Hinds County sheriff, as an expert in the field of JPD policies and procedures, general crime scene investigation, and law enforcement training. Lewis had worked for the City of Jackson for thirty years, and he had been involved in drafting police department policies and procedures. Lewis testified that Goldman had not followed department procedures in taking the 911 call by failing to keep Ruth Harrion on the line until police arrived and by not gathering information. He explained that the policy requiring the call taker to gather

8

information is in place to assure that the police have accurate information when responding to a call. Further, the call taker must try to keep the caller on the line so dispatch can determine whether the prowler has gotten into the house. Lewis testified that, if Goldman had kept Ruth Harrion on the line, the officers would have known the prowler had gotten into the house and could have responded appropriately. Lewis opined that Goldman's failure to follow the policy had resulted in Ruth Harrion's death. He opined that Goldman's actions evinced reckless indifference.

¶15.    Lewis testified that the investigating officers had violated General Order 600-4, requiring responding officers to protect life and property, secure the crime scene, deploy necessary personnel, establish communications, and restore order. He testified that the officers violated the policy by failing to determine the nature of the problem and to take appropriate action by securing the scene and notifying a field supervisor. Lewis testified that Heard and Evans should not have cleared the call without making every effort to contact Ruth Harrion, including calling backup and the supervisor. Further, he testified that the officers faced exigent circumstances that would have allowed them to break into Ruth Harrion's home. He identified the exigent circumstances as the opened window, the pushed-out burglar bars, and the recycling bin positioned below the window. Lewis knew of no rule or training preventing police officers with JPD from going over a fence. Lewis opined that the officers had not followed their training or applicable policies and procedures, resulting in Ruth Harrion's death. He opined that Evans and Heard had acted with reckless indifference to Ruth Harrion's life.

9

¶16. Lieutenant Joseph Wade gave expert testimony on behalf of the City. He was a deputy chief administrator for JPD and had been with the department for twenty-four years. Wade testified that when he was a beat cop he had responded to prowler calls. He explained that a threat to a person presents exigent circumstances that allow the police to enter a home without a warrant. But he testified that exigent circumstances do not exist when someone reports a prowler and then does not come to the door when police arrive. He testified that the police department's policies and procedures give the police discretion in determining how to respond in an investigation. Wade opined that Heard and Evans had not violated any policies in their response to Ruth Harrion's call. But regarding Goldman, Wade testified that a mandatory policy had been in place and that Goldman did not follow it at all. He testified that, after Ruth Harrion's death, the City of Jackson changed its policies and procedures for handling prowler calls so that what happened to Ruth Harrion would not happen to anyone else.

¶17. Corporal Loris Taylor testified for the City. Taylor was an instructor at the police training academy and had spent twenty-six years with JPD. He had been on duty the night of the crime, heard the call dispatched, and heard over the radio about what the officers were doing on the scene. Taylor testified that officers are trained not to enter a locked yard without probable cause due to the risk of attack by a canine or the homeowner defending his or her property. According to Taylor, the officers were not faced with exigent circumstances, and they lacked probable cause to enter Ruth Harrion's home because there were no signs of

10

forced entry. He opined that there was nothing else that Heard or Evans should have done before clearing the call.

¶18. The City's last expert was Mark Dunston, chief of police for the City of Ocean Springs, Mississippi. Dunston testified that he had thirty-four years' experience in law enforcement. He opined to a reasonable degree of professional certainty that the officers had not acted with reckless disregard or deliberate indifference to Ruth Harrion's rights. Dunston testified that Heard and Evans had investigated properly in compliance with the standards of JPD. Further, he testified that the City of Jackson's fence-crossing policy is consistent with that of other agencies. He testified that Heard and Evans had not been confronted with exigent circumstances that would have given them cause for a forced entry. He testified that persons not responding to the door is common. According to Dunston, if Heard and Evans had missed signs that Stewart had entered the house, then they did an inadequate investigation. However, their inadequate investigation did not rise to the level of reckless disregard or deliberate indifference. Dunston was the sole witness who testified that Goldman had done nothing wrong when she failed to instruct Ruth Harrion to remain on the line and failed to gather information.

¶19. Johnson presented expert testimony about Ruth Harrion's work life expectancy and testimony from Ruth Harrion's children about the impact of her loss on her family, friends, and community. When the City rested its case, it moved for a directed verdict, which was denied by the trial court. The jury awarded $1 million in damages for Johnson's § 1983

claim. The trial court found that the City was not immune from suit under the MTCA, found the City liable for Harrion's death, and awarded damages of $500,000.

## DISCUSSION

I.    **Whether the trial court erred by denying the City's motion for summary judgment on Johnson's § 1983 claims and MTCA claims.**

¶20.    The City filed a motion for summary judgment on all of Johnson's claims, which was denied. This Court denied the City's petition for an interlocutory appeal. In this direct appeal, the City assigns the denial of summary judgment as error. Johnson responds that the City waived this argument by not moving for a directed verdict or a JNOV pursuant to Rule 50 of the Mississippi Rules of Civil Procedure. The City points out that it did move for a directed verdict and argues that nothing prevents this Court's review of both the denial of summary judgment and the denial of its motion for a directed verdict, of which it complains in another assignment of error.

¶21.    This Court has not addressed the appealability, after a case has been tried, of a pretrial order denying summary judgment. The Court of Appeals has "held that appeals from the denial of a motion for summary judgment are interlocutory in nature and are rendered moot by a trial on the merits." *Miss. Bureau of Narcotics v. Hunter*, 311 So. 3d 629, 635 (Miss. Ct. App. 2020) (internal quotation mark omitted) (quoting *Franklin Collection Serv. Inc. v. Collins*, 206 So. 3d 1282, 1284 (Miss. Ct. App. 2016)). In its discussion of the issue in *Collins*, the Court of Appeals relied on the analysis by the United States Court of Appeals for the Fifth Circuit:

12

[P]rudential concerns argue against reviewing such motions. To review the pretrial denial of a motion for summary judgment, we would have to review two different sets of evidence: the "evidence" before the district court at pretrial when it denied the motion, and the evidence presented at trial. Of course, the "evidence" presented at pretrial may well be different from the evidence presented at trial. It makes no sense whatever to reverse a judgment on the verdict where the trial evidence was sufficient merely because at summary judgment it was not. . . . "The saving of time and expense is the purpose to be attained by a summary judgment in a proper case. When in due course the final trial is had on the merits it becomes the best test of the rights of the movant. If he wins on trial he has his judgment. If he loses on a fair trial it shows that he ought not to have any judgment."

*Collins*, 206 So. 3d at 1284-85 (alterations in original) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)). The Court of Appeals recognized that some federal courts have held that, although once the case has been tried the denial of summary judgment generally is not reviewable on appeal, an exception exists if the pretrial summary judgment ruling involved a pure question of law. *Id.* at 1285 (quoting *Blessey Marine Servs., Inc. v. Jeffboat, LLC*, 771 F.3d 894, 897 (5th Cir. 2014) (refusing to recognize the exception)). In *Collins*, the Court of Appeals found that even if it were to recognize the exception, the exception would not apply because the ruling before it did not involve a pure question of law. *Id.* at 1286.

¶22.    For the reasons stated by the Court of Appeals and by the Fifth Circuit, this Court adopts the general rule that, once a case has been tried, a pretrial order denying summary judgment will not be reviewed on appeal. Even if this Court were to embrace an exception for summary judgment rulings adjudicating pure questions of law, this is not such a case. We hold that the City's challenge to the denial of summary judgment is not reviewable on appeal.

13

We note that the City makes much the same arguments in its assignment of error challenging the denial of a directed verdict, which is addressed below.

## II. Whether the trial court erred by allowing Johnson's expert to rely on Stewart's statement to the police in formulating his opinion.

¶23. Before the trial, the City moved *in limine* to exclude Alonzo Stewart's confession. Johnson's counsel said they did not plan to seek admission of the confession. During direct examination of Detective McNeil, Johnson sought to introduce McNeil's police report into evidence. The City objected to the admission of portions of the police report that contained hearsay statements by Stewart. The trial court also addressed whether Stewart was unavailable and whether his statements were admissible as statements against his penal interest under Mississippi Rule of Evidence 804(b)(3). The court found that Stewart could not be compelled to testify against himself but found in addition that the Rule 804(b)(3) hearsay exclusion did not apply to Stewart's confession because his statements were not being offered against Stewart himself. Ultimately, the trial court ruled on the admissibility of Stewart's statements in the police report. Applying the trustworthiness analysis for admission of a police report set forth in *Rebelwood Apartments RP, LP v. English*, 48 So. 3d 483 (Miss. 2010), the trial court admitted the police report, but with Stewart's statements redacted.

¶24. This Court reviews a trial court's ruling admitting or excluding evidence for abuse of discretion. *Murray v. Gray*, 322 So. 3d 451, 457 (Miss. 2021) (citing *Hartel v. Pruett*, 998 So. 2d 979, 984 (Miss. 2008)). "Even though police reports, if offered in evidence to prove the truth of the matter asserted are hearsay and the information within them may be based on

hearsay, they may be admissible under the hearsay exception in Rule 803(8)." ***Rebelwood***, 48 So. 3d at 491. Under ***Rebelwood***, "[a] conclusion in a police report may be admitted if 'based on a factual investigation and [it] satisfies . . . [Rule 803(8)]'s trustworthiness requirement.'" ***Id.*** at 493 (second alteration in original) (quoting ***Fleming v. Floyd***, 969 So. 2d 881, 885 (Miss. Ct. App. 2006), *rev'd on other grounds by* ***Fleming v. Floyd***, 969 So. 2d 868 (Miss. 2007)). ***Rebelwood*** applied "four factors the Advisory Committee on Evidence Rules proposed for consideration of trustworthiness: '(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation.'" ***Id.*** at 493 (quoting ***Beech Aircraft Corp. v. Rainey***, 488 U.S. 153, 168 n.11, 109 S. Ct. 439, 102 L. Ed. 2d 445 (1988)). Further, whether statements in a police report were corroborated is another indicator of trustworthiness. ***Id.***

¶25.    In this case, the trial court found that all of ***Rebelwood***'s trustworthiness requirements for Stewart's statements in the police report were met except for corroboration. Although Johnson argued that Stewart's statements in the police report were corroborated because the police found the murder weapon where Stewart had said it was located, the trial court found that Stewart's statements in the police report were not corroborated and, therefore, were not trustworthy. For that reason, the trial court required that Stewart's statements be redacted before admission of the police report.

¶26.    Later in the trial, Johnson's expert, Levine, testified to his opinion that, when the police arrived, Stewart had been inside holding Ruth Harrion hostage. Levine testified that

15

he had relied on Stewart's confession in forming his opinion that Stewart had been inside. The City objected to Levine's reliance on Stewart's confession on the ground that the trial court previously had deemed his statements in the police report inadmissible. The trial court overrruled the objection and allowed Levine to testify about his opinion that Stewart had been inside, citing the evidentiary rule that experts are allowed to base their opinions on facts not in evidence. The City challenges the ruling on appeal.

¶27.     The City and the separate opinion authored by Chief Justice Randolph argue that, because the trial court previously had excluded portions of the police report that set forth Stewart's statements, the trial court abused its discretion by admitting an expert opinion formed in reliance on Stewart's statements. The City contends that Stewart's statements were inadmissible hearsay and, therefore, could not be relied upon by an expert. The City relies on *Rebelwood*. In *Rebelwood*, Tyrone Lewis gave expert testimony that contradicted hearsay statements in a police report. *Id.* at 491-92. The trial court had excluded the police report from evidence without considering its trustworthiness. *Id.* at 491. Therefore, the jury was presented with Lewis's testimony but not with the contradictory facts described in the police report. *Id.* at 492. On review, this Court found that Lewis's testimony had left the jury with a false impression, resulting in prejudice to the opposing party and denying that party a fair opportunity for cross-examination. *Id.* The Court found that the police report was trustworthy and that it should have been admitted. *Id.* at 493.

¶28.     The problem with the City's argument is that the ruling it challenges concerns a different rule of evidence than that at issue in *Rebelwood*. In *Rebelwood*, the Court

considered the admissibility under Rule 803(8) of hearsay statements in a police report. ***Id.*** at 491. The trial court here applied ***Rebelwood*** when it ruled on the admissibility of hearsay statements in a police report. But the City does not challenge the trial court's ***Rebelwood*** ruling on the police report. Instead, it challenges the trial court's later ruling that the expert opinions Levine had formed after reviewing Stewart's statements were admissible under Mississippi Rule of Evidence 703.

¶29.    Rule 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible." MRE 703. "When . . . the finder of fact is faced with expert opinion testimony based on facts not within the personal knowledge of the expert, that the undergirding facts are not within the personal knowledge of the expert goes to the overall weight of the expert's opinions." ***Brown v. State***, 168 So. 3d 884, 897 (Miss. 2015). Stewart's statements were part of the police report in this case, and Levine's testimony made clear that he routinely relies on the entire police file when forming expert opinions about police practices. ***Rebelwood*** addressed the admissibility of a police report containing hearsay, not the admissibility of the bases for expert testimony under Rule 703. Therefore, the City's argument is inapposite, and it has not shown that the trial court abused its discretion by admitting Levine's testimony under Rule 703. Although the separate opinion makes arguments based on Rule 702, the City did not raise Rule 702 in its arguments before the trial court.

17

¶30. Further, to the extent that the City argues that Levine's testimony was a conduit for otherwise inadmissible hearsay, an argument advanced by Chief Justice Randolph's separate opinion, this Court will affirm the trial court's evidentiary ruling if the trial court reached the correct result, but for the wrong reason. *Smith v. State*, 25 So. 3d 264, 273-74 (Miss. 2009). In *Smith*, this Court held that the trial court had erred by admitting a witness's prior inconsistent statements as substantive evidence under Rule 804(b)(5). *Id.* at 271. But because the witness's statements "were otherwise admissible under our rules of evidence," the Court affirmed, finding that the statements had been admissible under Rule 801(d)(1)(C) as statements of identification by a witness. *Id.* at 272-73. Our practice reflects the general rule. "If the evidence was admissible on any ground, the [trial] court's reliance on other grounds does not affect the defendant's substantial rights." *United States v. Portillo*, 969 F.3d 144, 174 (5th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Jensen*, 41 F.3d 946, 958 (5th Cir. 1994)).

¶31. In this case, the full police report, including Stewart's statements, was admissible. First, although Johnson did not seek to have Stewart's confession admitted, it was admissible as a statement against penal interest made by an unavailable witness. Stewart had been found mentally incompetent to stand trial. MRE 804(b)(3)(A). Rule 804(a) provides that "A declarant is considered to be unavailable as a witness if the declarant: . . . **(4)** cannot be present or testify at the trial or hearing because of . . . a then-existing . . . mental illness. . . ." Under Rule 804(b)(3)(A), "A statement that: **(A)** a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it

18

was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability . . . " is "not excluded by the rule against hearsay." Rule 804(b)(3)(B) imposes a trustworthiness requirement if the statement is offered in a criminal case, which this was not.

¶32. The discussion between the trial court and the parties reveals that the trial court correctly considered Stewart to be unavailable to testify. But the trial court found that the admissibility of statements against penal interest is limited to cases in which the statements are offered against the declarant. That finding was erroneous. What is required is that the statement "tend[s] to expose the declarant to criminal liability[.]" *Lacy v. State*, 700 So. 2d 602, 606 (Miss. 1997) (quoting MRE 804(b)(3)). Stewart's statements were admissible under Rule 804(b)(3)(A).

¶33. Second, the trial court found that the police report met all the indicia of trustworthiness outlined in *Rebelwood* except that Stewart's statements were uncorroborated. Although Johnson argued that Stewart's statements were corroborated because the murder weapon was found where Stewart told the police it would be, the trial court found that corroboration had to consist of other people to whom Stewart had repeated the information. The trial court's narrow ruling on what constitutes corroboration was incorrect. *Rebelwood* approved of physical evidence functioning as corroboration for hearsay statements in a police report.[2] *Rebelwood*, 48 So. 3d at 493. Stewart's statements in the police report were

---

[2] In his separate opinion, Chief Justice Randolph would restrict *Rebelwood*'s holding by mandating that corroboration exists only when the declarant repeated the information to several people. Logically, a statement can be corroborated in a variety of ways as *Rebelwood* cogently recognized by listing the ways in which the statement was corroborated.

corroborated not only by the location of the murder weapon, but also by Stewart's knowledge that the officers had responded to the scene and walked around the outside of the house and the fact that Harrion did not go to the door or answer her telephone when the police arrived. Because Stewart's confession independently was admissible and the police report containing his statements was admissible, any and all of the hearsay concerns articulated by the City and by Chief Justice Randolph's separate opinion are unfounded. The credibilty of Levine's opinion testimony was a matter for the jury to weigh.

¶34. Finally, Levine's testimonial opinion that Stewart was inside when the police arrived at Harrion's residence was cumulative of earlier testimony. Officer Heard testified that, after the slaying, she had learned that Stewart had been in the house with Ruth Harrion while she and Evans were investigating outside.[3] Although the City objected to Heard's testimony, it does not appeal the trial court's overruling of its objection. Because the jury already had heard testimony that Stewart had been inside with Harrion while the police were outside, any

*Rebelwood*, 48 So. 3d at 493.

[3] Specifically, Heard testified as follows:

> Q. What I was asking you is while this was going on, *you knew the perpetrator was in there with Ms. Harrion?* You know now, right?

> A. *I know now.* But I didn't know then.

(Emphasis added.) Shortly thereafter, the trial court ruled on the City's objection to Johnson's again asking Heard about Stewart's having been inside the house during the officers' investigation. In overruling the objection, the trial court recognized that Officer Heard already had testified that she was aware that Stewart had been inside: "[Heard] has admitted at this point that she now knows that he was in there." Because the jury already had heard testimony that Stewart had been inside, Levine's subsequent opinion testimony that Stewart had been inside was cumulative.

20

error in allowing Levine to testify that Stewart had said he was inside at that time was harmless and not a basis for reversal.

**III. Whether the trial court erred by denying the City's motion for a directed verdict on Johnson's § 1983 claims.**

¶35. After both parties had rested, the City moved for a directed verdict, which was denied. The City did not file a motion for JNOV or for a new trial. On appeal, the City argues that it was entitled to a directed verdict on Johnson's § 1983 claim. "A motion for directed verdict challenges the legal sufficiency of the evidence." *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1200 (Miss. 2012) (citing *McGee v. River Region Med. Ctr.*, 59 So. 3d 575, 578 (Miss. 2011)). "[W]hen the defendant moves for a directed verdict at the close of all the evidence, the court must consider the plaintiff's evidence along with any uncontradicted evidence put on by the defendant, all in the light most favorable to the plaintiff." *Upton v. Magnolia Elec. Power Ass'n*, 511 So. 2d 939, 943 (Miss. 1987) (citing *Baker Serv. Tools, Inc. v. Buckley*, 500 So. 2d 970, 972 (Miss. 1986)). If reasonable minds could differ on the verdict when the evidence is so viewed, the motion should be denied. *Id.* This Court applies *de novo* review to the trial court's denial of a motion for a directed verdict. *Lanier*, 97 So. 3d at 1200 (citing *McGee*, 59 So. 3d at 578). "In essence, judgments as a matter of law present both the trial court and appellate court with the same question—whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Miss. State Fed'n of Colored Women's Club Hous. for Elderly in Clinton, Inc. v. L.R.*, 62 So. 3d 351, 359-60

21

(Miss. 2010) (internal quotation marks omitted) (quoting *United Am. Ins. Co. v. Merrill*, 978 So. 2d 613, 624 (Miss. 2007)).

¶36.    Johnson brought claims pursuant to 42 U.S.C. § 1983. Section 1983 provides, in pertinent part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights; rather, it provides redress for a violation of a constitutional right or a right created by federal law. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). Municipalities are among those "persons" who may be held liable for violating civil rights under § 1983. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

¶37.    Because individual actors Goldman, Evans, and Heard had been dismissed from the lawsuit, Johnson proceeded to trial against the City alone. Importantly, a viable § 1983 claim against a municipality does not proceed upon a theory that the municipality is vicariously liable for the acts of its employees. *Id.* at 691 (holding that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Accordingly, Johnson had to show that the City itself violated her constitutional rights. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or

22

acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. For liability to attach, a municipality's "official policy" must be the "moving force of the constitutional violation . . . ." *Id.*

¶38.    The United States Court of Appeals for the Fifth Circuit has identified three elements of a § 1983 claim against a municipality. *Shumpert v. City of Tupelo*, 905 F.3d 310, 316 (5th Cir. 2018). "To establish municipal liability pursuant to § 1983, a plaintiff must demonstrate three elements: 'a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom.'" *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). Additionally, either the official policy itself must be unconstitutional or it must "have been adopted 'with deliberate indifference to the known or obvious fact that such constitutional violations would result.'" *Id.* (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004)). An official policy can be a written policy, or it might be "an unwritten but 'widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Gomez v. Galman*, 18 F.4th 769, 777 (5th Cir. 2021) (quoting *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018)).

¶39.    Johnson proceeded under several theories of municipal liability. First, she sought to show that Ruth Harrion's constitutional rights were violated because a policymaker at the City of Jackson had failed to adhere to the City's policies and procedures. On appeal, she advances the argument that Goldman was a policymaker for the City and that Goldman's failure to adhere to the written call center policies by not instructing Ruth Harrion to remain

23

on the telephone until the police arrived and by not asking her about the prowler's location amounted to a departure from policy by a policymaker, essentially making and implementing new municipal policy that violated Ruth Harrion's constitutional rights. Next, Johnson argues that the City failed to train Goldman, Heard, and Evans properly. To establish municipal liability based upon the failure to train, a claimant must show that "(1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Shumpert*, 905 F.3d at 317 (citing *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)). Alternatively, Johnson argues that the City ratified the unconstitutional conduct of its employees when the Civil Service Commission reinstated Goldman, Heard, and Evans after they were fired following Ruth Harrion's death. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) ("Municipal liability may be also be based on the decisions of employees with final policymaking authority or the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval.").

¶40.    It was undisputed that Goldman, Evans, and Heard were acting under color of state law at all relevant times. The City argues that it was entitled to a directed verdict because Johnson failed to demonstrate the City deprived Ruth Harrion of a federal right. At trial, Johnson argued that the City's policies deprived Ruth Harrion of her due process rights under the Fourteenth Amendment to the United States Constitution to liberty and freedom from

24

bodily harm.[4] But as the City avers, the United States Supreme Court has held that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). The Due Process Clause does not guarantee that states provide their citizens "certain minimal levels of safety and security." *Id.* While the State itself is not permitted to deprive its citizens of life, liberty, or property without due process, the Due Process Clause does not obligate states to ensure that those interests are protected from harm by private actors. *Id.* "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196.

¶41.    Therefore, "the Due Process Clauses [of the Fifth and Fourteenth Amendments] generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. In *DeShaney*, social workers received complaints that a father was abusing his child; but after an investigation they decided not to remove the child from his custody. *Id.* at 192-93. A subsequent beating by the father rendered the child comatose, and the mother filed a § 1983 suit alleging that the state had violated the child's due process right to liberty by failing to intervene to protect him from harm by his father. *Id.* at 193. The Court held "that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

---

[4] Johnson did not claim that Ruth Harrion's right to equal protection of the laws had been violated.

¶42. Johnson's claim is similar to that found insufficient in *DeShaney*. She argues that Goldman's failure to handle Ruth Harrion's 911 call according to the City's call center procedures and the officers' failure to conduct an adequate investigation of the call deprived Ruth Harrion of her right to liberty and freedom from violence because the City, had it performed properly, could have prevented Ruth Harrion's death. Considering the evidence in the light most favorable to Johnson, *DeShaney* establishes that the City's failure to protect Ruth Harrion from suffering a violent death at the hands of a prowler did not deprive her of a due process right because there is no due process right to state protection from private violence.

¶43. *DeShaney* recognized an exception to the rule for cases in which the state has a special relationship with the individual crime victim. *Id.* at 197-98. At the hearing on the City's motion for a directed verdict, Johnson touched on this exception by arguing that the City had created a special relationship with Ruth Harrion when Goldman told her she was sending the police to her home. Johnson argued that Ruth Harrion relied on Goldman's promise to send the police to her detriment by waiting for the police and not taking other measures such as calling her children. But Ruth Harrion's situation does not fit the special relationship exception, which is reserved for persons who were in state custody against their will, such as mental health patients and prisoners. *DeShaney*, 489 U.S. at 198-200.

¶44. Johnson's argument is a better fit with the state-created danger exception. Courts have recognized that exception based on language in *DeShaney* that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their

26

creation, nor did it do anything to render him any more vulnerable to them." *White v. City of Philadelphia*, 118 F. Supp. 2d 564, 568 (E.D. Penn. 2000) (alteration in original) (quoting *DeShaney*, 489 U.S. at 201). The United States Court of Appeals for the Fifth Circuit has not recognized the state-created danger theory. *Shumpert*, 905 F.3d at 324 n.60. But although the Fifth Circuit explicitly has declined to recognize that theory, it has set forth its elements. *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 865 (5th Cir. 2012). "[T]he state-created danger theory requires 'a plaintiff [to] show [1] the defendants used their authority to create a dangerous environment for the plaintiff and [2] that the defendants acted with deliberate indifference to the plight of the plaintiff.'" *Id.* (second, third, and fourth alterations in original) (quoting *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 537-38 (5th Cir. 2003)).

¶45.    Johnson did not rely explicitly on a state-created danger theory at the directed verdict hearing. In fact, on appeal she does not address the City's *DeShaney* argument at all. To the extent that Johnson's argument at the directed verdict hearing invoked a state-created danger theory, the argument should have failed. This Court has located no case in which another court has found that the failure of a call dispatcher or the police to respond properly to a 911 call, resulting in the caller's death, has been deemed a violation of the caller's due process rights. In *White*, a case with facts parallel to this one, neighbors heard screams coming from inside an apartment and called the police. *White*, 118 F. Supp. 2d at 567. When the police arrived, they knocked on the apartment door, but no one answered. *Id.* They refused to make a forced entry into the apartment. *Id.* But, unbeknownst to the officers, the victim was being

27

held hostage inside her apartment by a man who killed her after the police had left the scene. *Id.*

¶46. *White* found that the § 1983 claim brought by the victim's parents did not allege facts sufficient to establish a state-created danger. *Id.* at 568-69. In particular, the district court found that the officers had not created an opportunity for the crime to occur that would not have existed without their actions. *Id.* at 571. As in this case, the plaintiffs argued that, if the officers had intervened, the victim's death could have been prevented. *Id.* The district court rejected that argument because the officers' actions had not placed the victim in any greater danger than she already faced from the murderer. *Id.* In contrast, the district court cited *Kneipp v. Tedder*, 95 F.3d 1199, 1210 (3d Cir. 1996), in which police officers were found to have created a danger by separating an intoxicated woman from aid by her husband, resulting in her wandering off alone, falling, and suffering hypothermia. The district court found that, unlike in *Kneipp*, the officers responding to the 911 call "did not exert any control over [the murder victim's] environment or any source of private assistance." *White*, 118 F. Supp. 2d at 572. "Rather, the Officers 'simply let the events unfold as they stood idly by [].'" *Id.* (alteration in original) (quoting *Est. of Burke v. Mahoney City*, 40 F. Supp. 2d 274, 282 (E.D. Penn. 1999). Because the officers had done nothing to place the murder victim in jeopardy, but rather had failed to protect her from private violence, the state-created danger exception to *DeShaney* did not apply. *Id.*

¶47. The United States Court of Appeals for the Fifth Circuit dealt with a similar fact pattern in *Beltran v. City of El Paso*, 367 F.3d 299 (5th Cir. 2004). In *Beltran*, Sonye

28

Herrera had called 911 and reported that her father was drunk and possibly violent, that she was hiding in the bathroom, that she was afraid for her life, and that she thought her father had left the premises. *Id.* at 301-02. Previously, Herrera's father had been charged with abusing her physically, but she did not tell the 911 operator about any physical abuse. *Id.* at 301. The 911 operator gathered information about the father's car and possible destination, and then told Herrera that the police would be dispatched to the house. *Id.* at 302. Further, the 911 operator told Herrera that if she thought her father was still in the house, she should remain locked in the bathroom. *Id.* Because the 911 operator coded the call as a priority four call, the police did not respond immediately. *Id.* It turned out that the father had not left the house after all, and he shot and killed Herrera and her mother. *Id.*

¶48.    Herrera's grandmother, Manuela Beltran, brought a § 1983 action against the City of El Paso, alleging violations of the Equal Protection Clause and the Due Process Clause. *Id.* Beltran argued that the City had violated Herrera's due process rights by "falsely promis[ing] police services that [Herrera] relied on to her detriment." *Id.* at 307. First, Beltran argued that the City had created a special relationship with Herrera by telling her to stay in the bathroom and that the police were on the way. *Id.* But that argument failed because the Supreme Court has limited special relationships to "incarceration, institutionalization, or other similar restraint of personal liberty." *Id.* (internal quotation marks omitted) (quoting *DeShaney*, 489 U.S. at 200). By instructing her to stay in the bathroom, the city had not affirmatively placed Herrera in custody. *Id.*

29

¶49. The Fifth Circuit likewise rejected a state-created danger argument. First, the Court recognized that it had not adopted the state-created danger theory. *Id.* Second, it found that even if that theory were applicable, Beltran had failed to show that the 911 operator had acted with deliberate indifference to Herrera's situation by instructing her to stay in the bathroom and that the police were on the way. *Id.* at 308. The facts in this case are weaker than those in **Beltran** because Goldman did not instruct Ruth Harrion to stay in the house and await the arrival of the police. Rather, Goldman told her that the police were on the way. Goldman's assurance that the police were on the way did not amplify the danger Ruth Harrion faced from the prowler. The City did not use its authority to create a dangerous environment for Ruth Harrion. *Doe*, 675 F.3d at 865. Therefore, even if Johnson clearly were asserting a state-created danger argument, the argument would fail because the City did not increase the danger to Harrion in any way that has been recognized as a civil rights violation.

¶50. **DeShaney** held that there is no due process right to state protection from private violence. **DeShaney**, 489 U.S. at 197. Johnson failed to show a violation of Ruth Harrion's constitutional rights. Therefore, the City was entitled to a directed verdict on Johnson's § 1983 claim. The primary thrust of Johnson's proof at trial was not that a City policymaker had enacted some policy or policies, the moving force of which had violated Ruth Harrion's liberty right, but rather that, if City employees had followed and not violated the City's written policies, Ruth Harrion would not have suffered a violent death at the hands of Alonzo Stewart. We address next Johnson's state law tort claims based on violations of written policies by the City's employees.

30

**IV. Whether the trial court erred by finding the City liable under the MTCA.**

¶51.     Under the MTCA, "[a] governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim" that

> [a]ris[es] out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury . . . .

Miss. Code. Ann. § 11-46-9(1)(c) (Rev. 2019). The trial court found that Officers Evans and Heard and call dispatcher Goldman had acted with reckless disregard of Harrion's safety and well being and found the City responsible for their actions under the theory of *respondeat superior*. Moreover, the trial court found that the City was not entitled to discretionary function immunity. Under Section 11-46-9-(1)(d), the City cannot be liable for claims "[b]ased on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused . . . ." Miss. Code Ann. § 11-46-9(1)(d) (Rev. 2019).

¶52.     The standard of review this Court applies to the trial court's decision after a bench trial under the MTCA is well settled. *City of Jackson v. Powell*, 917 So. 2d 59, 68 (Miss. 2005). "The proper application of the MTCA is a question of law, which we review de novo." *City of Jackson v. Sandifer*, 107 So. 3d 978, 983 (Miss. 2013) (citing *Powell*, 917 So. 2d at 68). We "will not disturb a circuit court's [fact] findings after a bench trial unless 'they are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.'" *Id.* (quoting *Powell*, 917 So. 2d at 68). The circuit court's findings of fact "are safe on appeal

31

where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Law*, 65 So. 3d 821, 827 (Miss. 2011) (internal quotation mark omitted) (quoting *City of Ellisville v. Richardson*, 913 So. 2d 973, 977 (Miss. 2005)). Moreover, the circuit court, in its role as the fact-finder, has "the sole authority" for assessing witness credibility. *City of Jackson v. Brister*, 838 So. 2d 274, 279 (Miss. 2003) (citing *Yarbrough v. Camphor*, 645 So. 2d 867, 869 (Miss. 1994)).

¶53. Based on the actions of Goldman, we hold find that the trial court did not err by finding the City liable for Ruth Harrion's death. To determine whether an activity is a discretionary function, Mississippi employs the two-part public policy function test. *Wilcher v. Lincoln Cnty. Bd. of Supervisors*, 243 So. 3d 177, 187 (Miss. 2018). First the Court determines "whether the activity in question involved an element of choice or judgment." *Id.* (internal quotation mark omitted) (quoting *Miss. Transp. Comm'n v. Montgomery*, 80 So. 3d 789 (Miss. 2012), *overruled by* *Brantley v. City of Horn Lake*, 152 So. 3d 1106 (Miss. 2014), *overruled by* *Wilcher*, 243 So. 3d at 185)). If it does, then the Court must decide whether that choice or judgment involved social, economic, or political-policy considerations. *Id.* If both elements are met, then the governmental entity is protected by discretionary function immunity. *Id.*

¶54. Goldman's conduct in responding to Ruth Harrion's call did not involve an element of choice or judgment. The City's Public Safety Communications Operating Procedures Manual set forth mandatory directives for Goldman to follow in response to Harrion's call. One applicable directive provided that "the caller will be kept on the line whenever

possible." Another provided that "the call-taker/dispatcher shall determine whether the prowler was seen or heard, as well as his last known location. If possible, the caller should remain on the telephone, out of direct view, providing updated information until an officer arrives at the scene."

¶55. Goldman testified that those policies and procedures applied to how she was supposed to handle Ruth Harrion's call and that they did not involve choice or discretion. Yet Goldman did not attempt to keep Ruth Harrion on the telephone until the police arrived. Nor did Goldman attempt to ascertain the location of the prowler or whether the prowler had been seen or heard. Those omissions by Goldman contravened the City's mandatory written policies. Goldman agreed that she had failed to follow the mandatory policies. Lewis, Levine, and even the City's expert, Wade, all agreed that the policies that Goldman had failed to follow were mandatory and nondiscretionary. The City did not enjoy discretionary function immunity for the acts of Goldman.

¶56. We turn to the City's argument that the trial court manifestly erred by finding that Goldman had acted with reckless disregard for Ruth Harrion's safety and well being. Reckless disregard is "more than mere negligence, but less than an intentional act." *City of Jackson v. Lewis*, 153 So. 3d 689, 693 (Miss. 2014) (internal quotation marks omitted) (quoting *Law*, 65 So. 3d at 826)."Reckless disregard usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 995 (Miss. 2003) (internal quotation marks omitted) (quoting *Maye v. Pearl River Cnty.*, 758 So. 2d 391, 394 (Miss. 1999)).

Reckless disregard is present "when the 'conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved.'" *Id.* (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 910-11 (Miss. 2000)).

¶57. An officer's failure to follow official policy does not automatically constitute reckless disregard. *Miss. Dep't of Wildlife, Fisheries, & Parks v. Webb*, 248 So. 3d 772, 779 (Miss. 2018). Instead, when considering whether an officer acted in reckless disregard, this Court evaluates the totality of the circumstances and assesses the officer's actions objectively, focusing on all the factors that faced the officer. *Phillips v. Miss. Dep't of Pub. Safety*, 978 So. 2d 656, 661 (Miss. 2008). "Although reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." *Lewis*, 153 So. 3d at 693 (quoting *Richardson*, 913 So. 2d at 978).

¶58. The City argues that Goldman's actions did not constitute reckless disregard because she determined the caller's identity, her location, and the nature of the emergency. Further, she dispatched the call as a priority one call, the highest priority, and the officers were dispatched in two minutes. The City relies on *Davis v. City of Clarksdale*, 18 So. 3d 246, 247-48 (Miss. 2009), in which a 911 operator received a hangup call, returned the call but got no answer, and then dispatched an officer to investigate. The officer looked around the building but did not see anything unusual and left the scene. *Id.* at 248. Less than half an hour later, officers in a patrol car spotted broken glass and, upon investigating, discovered the

34

murdered caller inside the building. *Id.* This Court found that the officer's investigation constituted at most simple negligence. *Id.* at 250.

¶59.   But *Davis* did not address the actions of the 911 operator. Johnson showed that Goldman's failure to ask Ruth Harrion to remain on the telephone violated written procedures. Goldman provided no reason for her deviation from the procedures. She testified that the procedures were in place to save people's lives. Tyrone Lewis testified that, if Goldman had kept Ruth Harrion on the line, the officers would have known that the prowler had gotten into the house and could have broken in and saved Ruth Harrion. He testified that Goldman's actions evinced reckless indifference and that her failure to follow the call center policies had resulted in Ruth Harrion's death. Levine testified also that Goldman's failure to keep Ruth Harrion on the line showed reckless indifference to her life. Considered objectively, Goldman's failure to follow basic mandatory written policies applicable to her position that she knew were in place for the purpose of enabling the police to respond accurately to emergent situations in order to save lives, with no explanation whatsoever for her deviation from those policies, evinced reckless disregard. Therefore, the trial court did not manifestly err in its finding of reckless disregard.

¶60.   The City makes a one-sentence argument, unsupported by authority, that the trial court manifestly erred by finding that Johnson showed proximate cause attributable to Goldman's handling of the 911 call. "Failure to cite any authority in support of claims of error precludes this Court from considering the specific claim on appeal." *Tupelo Redev. Agency v. Gray Corp.*, 972 So. 2d 495, 514 (Miss. 2007) (citing *Grey v. Grey*, 638 So. 2d 488, 491 (Miss.

35

1994)). Notwithstanding the procedural bar, the issue is without merit. Johnson presented evidence that Stewart broke into Ruth Harrion's home moments after the 911 call was disconnected. Johnson's experts testified that, but for Goldman's failure to keep Ruth Harrion on the line, the police lacked information that Stewart had gained access to her home, information that would have provided the officers probable cause for their forcible entry. Officer Heard testified that, if she had known the prowler was inside, she would have forced entry. Because the trial court's findings were supported by substantial evidence, the trial court did not manifestly err by finding that the City's actions proximately caused Ruth Harrion's death. *Law*, 65 So. 3d at 827.

¶61. Finally, the City advances arguments that the officers' investigation was a discretionary function and that their investigation did not constitute reckless disregard. But finding the City immune from suit for the officers' actions would not absolve it of liability for the actions of Goldman, for which it clearly was not immune. We affirm the trial court's finding that the City was liable for Ruth Harrion's death under the MTCA.

## CONCLUSION

¶62. We reverse and render the jury verdict holding the City liable under § 1983. We affirm the trial court's judgment finding the City liable under the MTCA.

¶63. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**KING, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. RANDOLPH, C.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ. GRIFFIS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION.**

36

**RANDOLPH, CHIEF JUSTICE, SPECIALLY CONCURRING:**

¶64.    I concur with entry of judgment in the Mississippi Tort Claims Act case against the City of Jackson. I also agree with Presiding Justice Kitchens that the trial court committed reversible error in entry of judgment for the Plaintiffs in their § 1983 action. I write separately to address a reversible error that preceded the trial court's failure to direct a verdict for the City in the § 1983 action.

¶65.    The trial court erred when it permitted the Plaintiff's witness Levine to parrot previously excluded evidence over the City's objection.  The trial court found that an officer's synopsis of the murderer Stewart's interview was hearsay and failed to meet a Mississippi Rule of Evidence 803(8)(B) exception.  The trial judge determined the synopsis was not "corroborat[ed] just because somebody else was present when this statement was made" as the statements at issue in *Rebelwood Apartments RP, LP  v. English*, 48 So. 3d 483 (Miss. 2010), were separately corroborated. Levine testified that he relied on the incoherent and rambling statement of a deranged murderer, a person he described as not having a "sound mind" and "was not . . . acting in a normal way". Yet during the trial Levine was allowed to parrot portions of the excluded out of court statement verbatim. In allowing portions of the excluded statement to be repeated before the fact-finders, the court, and the jury, the trial court failed to fulfill its gatekeeping responsibilities. *See* Miss. R. Evid. 101-105, 403, 702, 703 and 705.

¶66.    Article VII of the Mississippi Rules of Evidence sets forth the conditions that must be met for a witness to qualify as an expert. *See* Miss.  R. Evid.  701-706. The trial judge acts

as a gatekeeper to ensure these conditions are met. Article VII rules were not designed as a conduit for the entry of unreliable and/or untrustworthy statements, which a trial court previously deemed were inadmissible. An intrinsically untrustworthy or unreliable statement does not become a sufficient fact or permissible data as contemplated by Rule 702. See Miss. R. Evid. 701, 702, 703, 705. Facts or data must have a modicum of truth and reliability before reliable principles and methods can be applied. *See* Miss. R. Evid. 702. Nary a rule of evidence elevates an unreliable and/or untrustworthy statement to the status of fact or data to be relied upon, as contemplated by Rule 703. *See* Miss. R. Evid. 703.

### FACTUAL AND PROCEDURAL HISTORY

¶67. During the course of the police investigation, Stewart provided a rambling, incoherent statement regarding the assault and murder of Harrion.[5] Stewart was separately adjudicated to be mentally incompetent to face criminal charges in a trial for Harrion's murder.

¶68. Before trial, the City moved in limine to exclude an entry in the police report, a synopsis of an interview of Stewart as hearsay. Plaintiff's counsel stated it had no intention to use Stewart's the unsworn statement.

> MR. DAVIS: We object -- in a bench trial we can object spontaneously and let the Judge rule. Basically the primary concern we have is this intended use of the statement, unsworn statement of the ---
>
> MR. SWEET, III: Assailant, we're not putting it in.
>
> MR. DAVIS: You're not putting it in?

---

[5]Levine acknowledged that Stewart gave a non-transcribed interview to investigators that contained multiple inconsistencies. According to arguments before the Court, the taped interview included, "[Harrion] flew out the window like Superman after he shot her in the head."

MR. SWEET, III: No. Why would I put it in?

¶69.    Once the trial began, Plaintiffs sought to introduce the entire police report, which included an officer's synopsis of the previously excluded interview of Stewart. The City objected again. The police report was properly admitted into evidence after the officer's synopsis of the interview was redacted. The City continued its objections when Levine testified from a portion of the officer's synopsis.

> MR. DAVIS: Our concern is that this is a backdoor opportunity to get in that already-excluded testimony. And it can easily be redacted. But he needs to understand that he can't discuss anything he obtained from that statement of Alonzo Stewart.

> THE COURT: I've considered you-all's argument. I'm going to allow him to testify as it relates to his report. I don't know what he will say. But I'm -- you know, if that's what comes out then you all have your expert to refute it, okay.

¶70.    Subsequently, direct testimony was solicited from Levine regarding the officer's synopsis. Levine testified he relied on the police report synopsis and what he picked up from listening to the tape. He was then allowed to repeat and quote portions of the excluded testimony to the court and to the jury. Levine proceeded to offer an opinion[6] based on the previously excluded proffer.

> Q. Tell the ladies and gentlemen of the jury how you reached that opinion that he was in the house while the -- are outside the house.

> A. I heard the man's statement, his confession. And that told me beyond a reasonable certainty that he was in the house molesting, sexually molesting,

---

[6]The trial court also erroneously allowed Plaintiff's other expert, Tyrone Lewis, to rely on the excluded notes to formulate his opinion. However, since the City's statement of the issues complains of an expert singularly and focuses its argument on Levine, we shall do likewise.

39

assaulting; and, at the same time, watching the police moving around outside the house.

Q. Do you have an opinion as to a reasonable degree of professional certainty that he was in the house, that he obtained a weapon from Ms. Harrion?

A. Yes.

Q. Tell the ladies and gentlemen of the jury what your opinion is.

A. Yes, sir. Because since that time, I was also in the house and I saw the bullet hole where she tried to shoot the man.

## STANDARD OF REVIEW

¶71.    This Court reviews the admission or exclusion of evidence under an abuse of discretion standard of review. *Hartel v. Pruett*, 998 So. 2d 979, 984 (Miss. 2008). "Abuse of discretion is found when the reviewing court has a 'definite and firm conviction' that the court below committed a clear error of judgment and the conclusion it reached upon a weighing of the relevant factors." *McCord v. Healthcare Recoveries, Inc.*, 960 So. 2d 399,405 (Miss. 2007) (internal quotation marks omitted) (quoting *Ill. Cent. R.R. v. McDaniel*, 951 So. 2d 523, 526 (Miss. 2006).

## STATEMENT OF THE ISSUES

¶72.    The City's brief reads, "**the trial court erred in allowing Plaintiff's expert to render an opinion based upon inflammatory, prejudicial, and unreliable inadmissible hearsay testimony**." (Emphasis added.)

## DISCUSSION

¶73. The trial court failed its gatekeeping responsibility when the Plaintiff's expert was permitted to inject previously excluded hearsay evidence into the proceeding. The trial court erred when it accepted Plaintiff's argument that Rule 703 opened the door for an expert to rely and testify about previously excluded hearsay evidence.

> **I.** **The trial court erred by accepting Plaintiff's arguments that Rules 702 and 703 permitted Levine to quote parts of Stewart's interview, despite having previously excluded Stewart's interview.**

¶74. Mississippi Rule of Evidence 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of *reliable* principles and methods; and
> >
> > (d) the expert has *reliably* applied the principles and methods to the facts of the case.

Miss. R. Evid. 702 (emphasis added). A synopsis of Stewart's interview did not contain scientific, technical, or specialized knowledge possessed only by experts. It does not take expertise in these defined categories for any witness, expert or otherwise, to repeat inadmissible hearsay evidence. This Court has held that "[u]nder the modified ***Daubert***[7] standard, the trial court must first determine whether expert testimony is *relevant* and,

---

[7]***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

second, whether the proffered testimony is *reliable*." ***Gulf S. Pipeline Co., LP v. Pitre***, 35 So. 3d 494, 498 (Miss. 2010) (internal quotation marks omitted). Merely speculative expert opinions based on hearsay should not be admitted. *See* ***Edmonds v. State***, 955 So. 2d 787, 792 (Miss. 2007) ("a court should not give . . . an expert carte blanche to proffer any opinion he chooses"); ***Tunica Cnty. v. Matthews***, 926 So. 2d 209, 214 (Miss. 2006) ("[T]he trial court is vested with a gate-keeping responsibility to prevent the admission of expert testimony based on guess or conjecture. " (citing ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 41 (Miss. 2003))). In the case *sub judice*, the court had already determined that the rote testimony presented to the jury by Levine was uncorroborated and failed its trustworthiness analysis of the hearsay exception Rule 803(8)(B). *See* Miss. R. Evid. 803(8).[8] The trial court found the majority of the report was trustworthy, but the synopsis of the

---

[8]**(8) Public Records.** A record or statement of a public office if:

  **(A)** it sets out:

  (i) the office's activities;

  (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law enforcement personnel; or

  (iii) in a civil case or against the prosecution in a criminal case, factual findings from a legally authorized investigation; and

  **(B)** the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Miss. R. Evid. 803(8).

interview was hearsay within hearsay. *See* Miss. R. Evid. 805.[9] Unlike ***Rebelwood*** , in which

the declarant told numerous individuals aside of police, the interview of Stewart capsulated

by the officer was not independently corroborated. ***Rebelwood Apartments***, 48 So. 3d at 492.

As there was no independent corroboration, the trial judge was correct to require redaction

of portions of the police report.

¶75.    This Court in ***Watts v. Radiator Specialty Co.***, 990 So. 2d 143 (Miss. 2008), found

an expert's testimony to be scientifically unreliable. The Court cautioned that juries place

greater weight on the testimony of an expert witness than that of a lay witness. ***Id.*** at 147.

The Court found that the claimed studies the expert relied upon to reach his conclusions were

not reliable. ***Id.*** Thus, the Court excluded the expert's testimony. ***Id.***

¶76.    Likewise, in ***Edmonds v. State***, the court excluded the expert's opinion because it was

not based upon reliable methods and procedures. ***Edmonds***, 955 So. 2d 787, 792 (Miss.

2007).  The court noted, "you cannot look at a bullet wound and tell whether it was made by

a person pulling the trigger or two persons pulling the trigger simultaneously." ***Id.***  The court

held that the expert's testimony was mere impermissible speculation. ***Id.*** Nor can one look

at a bullet hole in the wall and opine who fired the gun or know that the victim was being

molested and assaulted while police were present, as Levine opined. *See* supra ¶ 66;

***Edmonds***, 955 So. 2d at 792.

¶77.    In ***Pitre***, the Court held that since the expert's opinion lacked reliability when

examined through the lens of Rule 702, it should have been excluded. ***Pitre***, 35 So. 3d at 500.

---

[9] "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Miss. R. Evid. 805.

Levine's opinion that Stewart was in the house was based on an "uncorroborated" statement, which failed a Rule 803(8)(b) trustworthiness test. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . the testimony is a product of reliable principles and methods. Miss. R. Evid. 702. To this day, the accuracy, reliability, or truthfulness of the officer's synopsis of Stewart's interview is unknown. Stewart's rambling, incoherent confession, which included a claim that after he shot the victim "she flew out of the window like Superman," was not an established fact and contained no scientific data on which an expert could rely. Introduction of out-of-court statements of a person who has been judicially adjudicated to lack mental competency also presents reliability and trustworthiness concerns.

¶78.    A trial court cannot perform its gatekeeping duties without first determining whether a witness is qualified as an expert, before considering Rule 703, which is directed specifically to experts. *See supra* ¶ 72. The rules are unequivocally intertwined. A trial court must look to the reliability or lack thereof of proposed testimony of an expert. The rules support that exact notion. "The testimony [must be] the product of *reliable* principles and methods," and facts that [an] expert "in the particular field would reasonably rely." *See* Miss. R. Evid. 702, 703 (emphasis added).

¶79.    The Plaintiffs abused Rule 703. Rule 703 states that

> an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible.

Miss. R. Evid. 703. However, when a court has previously excluded specific evidence as inadmissible, Rule 703 does not transform inadmissible evidence into admissible evidence. Rule 103(e) prevents a jury from hearing inadmissible evidence.[10] The intended use of Rule 703 allows scientists to rely on Newton's law of gravity or Einstein's theory of relativity, without requiring their admission first. Expert witnesses are not conduits for parroting otherwise inadmissible testimony before a tribunal. *Darnell v. Darnell*, 167 So. 3d 195, 208 (Miss. 2014). Condoning what occurred in this case makes a mockery not only of Rule 703, but it also operates to defeat the purpose of the rules of evidence. *See* Miss. R. Evid. 102.[11] Rule 703 allows an expert to rely on evidence that has not been admitted to formulate an opinion, but it does not in turn bestow a right to quote previously excluded evidence verbatim. Inadmissible hearsay evidence is not resurrected as admissible evidence, just because a witness claims to rely on it. *Richardson ex rel. Richardson v. DeRouen*, 920 So. 2d 1044, 1049 (Miss. Ct. App. 2006).

## II.     The trial judge failed to properly apply Rule 403.

¶80.     To the extent practicable, the court must seek to conduct a jury trial by protecting a jury from considering inadmissible testimony. *See* Miss. R. Evid. 103(e). The court must

---

[10] "**(e) Preventing the Jury from Hearing Inadmissible Evidence.** To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Miss. R. Evid. 103(e).

[11] "These rules shall be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." Miss. R. Evid. 102.

45

decide, *inter alia*, whether evidence is admissible. Miss. R. Evid. 104(a). Mississippi Rule of Evidence 403 reads:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

In determining whether testimony is to be prejudicial, "the test, pursuant to Rule 403, is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *Utz v. Running & Rolling Trucking, Inc.*, 32 So. 3d 450, 458 (Miss. 2010). Allowing one witness to rely and another not only to rely but also to repeat an untrustworthy and unreliable out-of-court statement prejudiced the City. Levine's utterance of Stewart's words was hardly harmless, as it affected substantial rights of the City. *See* Miss. R. Evid. 103. The trial court abused its discretion by allowing a substantively more prejudicial than probative statement to be admitted and permitting a party to elude the purpose of the rules of evidence.

¶81.    Levine's testimony was an essential element of Plaintiff's § 1983 case, i.e., whether exigent circumstances were present when the JPD officers were at the premises. Levine's rote testimony of the excluded statement was the only testimony presented to the jury which placed Stewart inside Harrion's house when the police officers first investigated the call.

¶82.    After the jury had heard the inadmissible evidence, Levine conceded that the statement he relied on was inconsistent and irrational. Levine also conceded there was no other evidence putting Stewart inside the house, sans Stewart's interview.

46

¶83. The majority opines that Levine's testimony that Stewart was inside when the police arrived was cumulative of Officer Heard's testimony.[12] Both Levine and Heard's testimony was based on excluded evidence and/or was mere speculation and conjecture. *See* Miss. R. Evid. 701, 702, 703, and 705. Such error requires reversal of the jury verdict and judgment, aside from not granting the City's motion for directed verdict.

**MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., JOIN THIS OPINION IN PART.**

**GRIFFIS, JUSTICE, SPECIALLY CONCURRING:**

¶84. I disagree with the trial court's finding that the City of Jackson acted with reckless disregard and is liable for Ruth Harrion's death under the Mississippi Tort Claims Act.

¶85. Nevertheless, I recognize that this Court's standard of review on appeal requires this Court to affirm. *See **City of Jackson v. Lewis***, 153 So. 3d 689, 693 (Miss. 2014) ("Although reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." (internal quotation marks omitted) (quoting ***City of Ellisville v. Richardson***, 913 So. 2d 973, 978 (Miss. 2005))).

¶86. Mississippi Code Section 11-46-9 (Rev. 2019) (emphasis added) states in pertinent part:

---

[12] Officer Heard's testimony was equivocal. Officer Heard first testified that she "did not know" whether Stewart was in the house. After Plaintiff's counsel reframed the question, she testified that she "knew now" that Stewart was in the house. That speculative response was dependent upon the excluded synopsis of another officer, a fact not in evidence. *See* Miss. R. Evid. 701. However, since the City failed to raise this issue on appeal, we shall do likewise.

(1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:

. . . .

(c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection *unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury*[.]

In *City of Jackson v. Lipsey*, this Court agreed "that reckless disregard would encompass gross negligence[,]" but it held that "reckless disregard is a higher standard than gross negligence by which to judge the conduct of officers." *City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (Miss. 2003) (quoting *Turner v. City of Ruleville*, 735 So. 2d 226, 229-30 (Miss. 1999)). The Court explained,

> "Disregard" of the safety of others is at least negligence if not gross negligence. Because "reckless" precedes "disregard," the standard is elevated. As quoted above from Black's Law Dictionary, "reckless," according to the circumstances, "may mean desperately heedless, wanton or willful, or it may mean only careless, inattentive or negligence." In the context of the statute, reckless must connote "wanton or willful," because immunity lies for negligence. And this Court has held that "wanton" and "reckless disregard" are just a step below specific intent.

*Id.* at 691-92 (citations omitted) (quoting *Turner*, 735 So. 2d at 229-30).

¶87. "'[R]eckless disregard' embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Turner*, 735 So. 2d at 230 (quoting *Raney v. Jennings*, 248 Miss. 140, 158 So. 2d 715, 718 (1963)). Reckless disregard "is usually 'accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow.'" *City of Jackson v. Presley*, 40 So. 3d 520, 523 (Miss.

2010) (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000)). Reckless disregard exists "when the 'conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved.'" *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 995 (Miss. 2003) (quoting *Maldonado*, 768 So. 2d at 910-11).

¶88. Here, the record reflects that Debra Goldman's conduct evinced "some appreciation of the unreasonable risk involved." *Id.* (quoting *Maldonado*, 768 So. 2d at 910-11). Indeed, Goldman acknowledged that the City's public safety communications operating procedures were in place to save people's lives, and she testified that because Harrion reported a felony in progress, she dispatched the call as a "priority one" call, the highest priority.

¶89. But the record does not reflect that Goldman "deliberate[ly] disregard[ed] . . . th[e] risk and the high probability of harm involved." *Id.* (quoting *Maldonado*, 768 So. 2d at 910-11). Goldman testified that when the call came in, she "typed the call up real quick and sent it to the dispatcher." The record reflects that the call was dispatched five minutes after the call came in, and officers arrived on the scene six minutes later. Goldman further testified that she was concerned about Harrion's welfare, which was why she dispatched the call as a priority one call. She explained that prowler calls are typically considered priority two calls, but because Harrion reported a felony in progress and because it was at night, she dispatched the call as a priority one call.

¶90. Additionally, while it is clear that the call was disconnected, it is unclear how the call was disconnected. Goldman testified that after she advised Harrion that officers had been

49

dispatched, Harrion said thank you and hung up. Goldman explained that she did not expect Harrion to hang up when she did. After the call ended, Goldman discussed the call with the dispatcher, and they attempted to call Harrion back.

¶91. While Goldman acknowledged that she failed to *ask* certain questions related to the City's public safety communications operating procedures, the record shows that she did not *deliberately* disregard those procedures. The procedures at issue state:

> PROCEDURE: 300/1.10
>
> BURGLARY/PROWLER
> 2.6    When receiving Prowler calls, the call-taker/dispatcher shall *determine* whether the prowler was seen or heard, as well as his last known location. *If possible*, the caller *should* remain on the telephone, out of direct view, providing updated information until an officer arrives at the scene.

(Emphasis added.)

> PROCEDURE 300/2.02
>
> PROCEDURES
> 2.1    [U]pon learning that the caller is reporting an in-progress felony crime, the call-taker will determine the nature and location of the crime, and the name of the business, if applicable. *The call-taker will instruct the caller to remain on the line.*

(Emphasis added.)

¶92. Goldman testified that based on the call and Harrion's calm demeanor, she *determined* that Harrion had not seen the prowler and that the prowler was around Harrion's residence. Specifically, Goldman testified, "[Harrion] was calm. . . . I determined that [Harrion] didn't see anything. . . . I determined that [Harrion's] location was where the [prowler] possibly was."

50

¶93. Regarding Goldman's failure to instruct Harrion to remain on the phone, Procedure 2.6 did not mandate that Harrion remain on the line. Instead, the procedure simply states that the caller "should" remain on the line "if possible." While Procedure 2.1 required Goldman to instruct Harrion to remain on the line, Goldman testified that Harrion hung up unexpectedly. Goldman explained that had Harrion remained on the line, she would have asked more questions. Goldman further explained that she attempted to call Harrion back after the call was disconnected.

¶94. While Plaintiffs presented expert testimony that Goldman's actions constituted reckless disregard, the City presented expert testimony that Goldman did not act with reckless disregard. Specifically, Mark Dunston testified that Goldman's "primary job" was "to get information and send the police officer to that spot where they got the information from" and that Goldman did this. Dunston opined that even if Goldman's actions were inadequate, they did not rise to reckless disregard.

¶95. "By requiring a finding of 'reckless disregard of the safety and well-being of others,' the Legislature set an extremely high bar for plaintiffs seeking to recover against a city for a police officer's conduct while engaged in the performance of his or her duties." ***Presley***, 40 So. 3d at 523 (quoting Miss. Code Ann. § 11-46-9(1)(c)). "The City is immune from liability for acts of negligence, and even gross negligence is not enough." ***Id.*** While Goldman's actions were negligent, in my opinion they did not amount to reckless disregard. Indeed, Goldman's actions did not reflect a "conscious indifference to consequences, amounting almost to a willingness that harm should follow," ***id.*** (internal quotation mark

51

omitted) (quoting *Maldonado*, 768 So. 2d at 910), nor do they reflect "a deliberate disregard of [the unreasonable] risk [involved] and the high probability of harm involved." *Durn*, 861 So. 2d at 995 (quoting *Maldonado*, 768 So. 2d at 910-11).

¶96.    I disagree that the City acted with reckless disregard.  But based on our standard of review, I concur with this Court's overall disposition of this case.